## 𝖂𝖞𝖙𝖍𝖊𝖛𝖎𝖑𝖑𝖊.

NORFOLK & WESTERN RAILWAY CO. V. PHILLIPS' ADMINIS-
TRATRIX.

June 12, 1902.

Absent, Buchanan, J.

1. MASTER AND SERVANT—*Negligence in Selecting Servants—Negligence
   of Fellow-Servant—How Charged.*—In an action to recover damages
   for an injury inflicted by a defendant it is generally sufficient to aver
   in the declaration that the injury was inflicted by the wrongful
   act, neglect, and default of the defendant, without giving the par-
   ticulars of his misconduct, but if the cause of action is alleged to
   have been the carelessness or negligence of the defendant, in em-
   ploying or retaining in his service an unfit and incompetent ser-
   vant, it is necessary to aver that the servant was guilty of some act
   of negligence or unskillfulness directly contributing to the injury.

2. EVIDENCE—*Pertinency.*—If the injury alleged in the declaration is
   not alleged to be due in any way to the absence of a particular
   person, evidence as to his absence is not admissible.

3. EVIDENCE—*Relevancy.*—Evidence of a fact which adds force and
   effect to other evidence properly in a case is pertinent and admis-
   sible.

4. DEATH BY WRONGFUL ACT—*Damages—Probable Earnings—Mortality
   Tables.*—In an action to recover damages for death occasioned by
   the wrongful act or neglect of the defendant, it is not essential to
   introduce mortality tables to show the probable duration of life of
   the deceased. The "probable earnings" of the deceased, consider-
   ing his age, business capacity, experience, habits, energy, &c., may
   be shown either directly or indirectly.

5. MASTER AND SERVANT—*Non-Assignable Duties—Inspection and Repair
   of Machinery—Concurring Negligence.*—The duty of inspecting and
   repairing cars in use on a railroad is a non-assignable duty of the
   master, and the negligence of anyone entrusted with the perform-

ance of that duty is the negligence of the master. This is not a risk the servant is required to take, and if an injury to a servant has been caused by the default of a fellow-servant concurring with the negligence of the master, the master is liable as though he only were at fault.

6. MASTER AND SERVANT—*Vice-Principal—Fellow-Servant.*—A servant may be, in relation to a co-servant, a vice-principal in one relation, and a fellow-servant in another, depending on the particular duties he is discharging at the time.

7. MASTER AND SERVANT—*Defective Machinery—Risks Incident to Service—Instructions.*—A servant cannot recover for an injury inflicted by the use of defective machinery where the master has done his whole duty in selecting and keeping in repair such machinery; and a refusal, on request, to so instruct the jury, is not cured by an instruction merely stating that a servant assumes the risks incident to the service he enters.

Error to a judgment of the Circuit Court of Carroll county, rendered May 5, 1900, in an action of trespass on the case wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*J. C. Wysor* and *D. W. Bolen,* for the plaintiff in error.

*Hoge & Hoge* and *W. S. Tipton,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This is a writ of error to a judgment in action of trespass on the case, brought in the Circuit Court of Carroll county by the administrator of Andrew S. Phillips, deceased, against the Norfolk and Western Railway Company, to recover damages for the death of his intestate, alleged to have been occasioned by the negligence of the defendant company.

There is practically no conflict in the evidence, and it proves the following state of facts:

"Betty Baker," about twenty-five miles from Pulaski, is a

small station in Carroll county, on a branch road of the defendant company (plaintiff in error here). Pulaski is a terminal point at which the company keeps an organized inspection force. From "Betty Baker" the company has a road running a distance of two or three miles to the "Betty Baker" mines, on the Gossan iron lead, where the Virginia Iron, Coal & Coke Company was mining ore at the time of the disaster out of which this suit arose. The track of this branch runs up to the tipple at the mines, and a little beyond, and the ore cars are pushed up under the tipple, from which they are loaded with ore by employees of the mining company. On the morning of the 30th of January, 1900, the defendant sent some cars to the tipple to be loaded with ore, and four of them were loaded with iron ore by one D. F. Beasley. When he began to load them, he discovered that one of them had defective brakes. This car was No. 6884, and was standing in front of three other cars to be loaded with ore, and furthest from the tipple in the direction of "Betty Baker" station to the east. There was absent from the front brake on this front car No. 6884, a pawl or finger latch, which is kicked by the brakeman into the cogs of the ratchet wheel to hold the brake in its place after it had been applied by the brakeman with his hands. This brake was good in every other respect, and could be applied by a brakeman and held in position by him, but he could not fasten it so that he could apply other brakes. The rear brake on this car was defective—its chain being too long—so that it could not be wound around the brake rod and give the brake its full power. When this car was left at the tipple, Beasley coupled it to the car in the rear of it, and placed chocks under its wheels for the purpose of holding it in position. The car in the rear of it had at least one good brake, and it appears that one good brake is usually sufficient, under ordinary conditions, at least on standard cars. It was claimed by the defendant company that car No. 6884 was inspected by the regular inspector at Pulaski, on the morning of January 30,

before it started for "Betty Baker" mines, and nothing wrong was found with it, and that the pawl, or iron finger latch, to the ratchet wheel on its front brake was lost, and the chain on its rear brake became too slack, in transit. On January 31, 1900, defendant company's freight train No. 75 arrived at "Betty Baker" station, in charge of Conductor Davis, and, upon its arrival there, Davis remained at the station to look after loading freight, &c., as is claimed, and sent the train, in charge of the engineman, fireman and two brakemen—Kegley and McNew—to "Betty Baker" mines with some empty ore cars to be left there, to be loaded with ore, and bring away loaded ore cars, and any other cars which were to be brought away. At the mines there is a siding on which cars are shifted on to the main track and into the train, and when the crew reached there they found the four loaded ore cars on the main track at or near the tipple to be brought away, two cars on the siding completely loaded with cross-ties to be brought away, and two cars on the siding partially loaded with cross-ties, which were to be left for the completion of their loads. This siding which leaves the main line on the southeast of the tipple, connecting with it again lower down, held eight or ten cars; and a number of cars can stand on the main track west of the western end of the siding. The grade of the tracks at the mines appears to be comparatively light, but that of the main line increases on leaving the siding in the direction of "Betty Baker" station, and is a down grade. When necessary or convenient to do so, cars on the main track west of the siding are dropped on the siding by gravitation and stopped with brakes, and the siding is also, as before stated, used otherwise for switching purposes. A derailing switch is placed in the siding near its eastern end; and nearly opposite this derailing switch, but little east of it, there is a derailing switch in the main line. On the morning of January 31, 1900, plaintiff's intestate and four other section hands of the defendant company employed on that part of its

line had loaded some cross-ties upon cars on the siding, at the
"Betty Baker" mines, to be distributed over the road, and were
told by their foreman to go down the railroad on a hand or
pump car ahead of the train, which they proceeded to do. As
before stated, the train crew had brought some four or five
empty cars to be left at the mines to be loaded with ore. There
were two cars on the siding completely loaded with cross-ties.
West of them, in the direction of the ore tipple, there were two
cars partially loaded with iron ore, fastened together in couples,
on the main line west of the siding. The engine and the empty
cars stood on the main track, and the duty then to be performed
by the train crew, or the movement to be made by them, was
to take away the loaded ore cars on the main track, and put the
empties in their places, and to take away the two loaded tie cars
on the siding, and let the two partially loaded tie cars remain on
the siding. The first thing done in this movement was to take
all of the tie cars, by the use of the engine from the siding, and
place them on the main track against the empty cars. Brake-
men Kegley and McNew continued the movement by under-
taking to drop the loaded ore cars down on the siding by gravi-
tation, and to stop them with the brakes. · If they had succeeded
in this part of the movement, then the engine would have
pushed the tie and the empty cars up the main track, and left
the partially loaded tie cars there to be drifted on the siding,
where they were to remain, and left the empty cars on the main
track above the siding to be loaded with iron ore, and would
then have returned with the loaded tie cars, and gone upon the
siding at its east end, and coupled to the ore cars which had
been drifted on the siding, and then gone away on its journey.
But when Brakemen Kegley and McNew started to make this
part of the movement, *i. e.*, the drifting of the cars on the siding
by gravitation, Beasley told Kegley that he was the man that
put the chocks under the front car, and that he (Kegley) had
better let that car alone; that the brakes were not good, and

would not hold it, and it would go down the mountain with him.
Kegley replied, "Better had stop," and proceeded to take out
the chocks, and to turn the two front ore cars loose and get upon
the front car at the point where the pawl, or the iron finger
latch, was gone, and began to try to use the front brake, but
finding that he could not make it hold, went to the rear brake,
and found that it too would not work because of the loose chain
thereon. The rear brake of the second car was on, but was not
sufficient to hold the car; certainly not both of them. As soon
as Kegley started the two front cars, Beasley told McNew to
help Kegley, but McNew only looked at Kegley, and then
turned the other two ore cars loose. Finding that the two cars
he had started could not be controlled with the brakes on them,
and that they were getting away from his control, Kegley, for
his own safety, jumped off, and the cars, with rapidly increasing
speed, "ran wild," overtaking the section men on the hand car
in a cut about a mile from the mines, and ran into them at a
high rate of speed, killing four of them, including plaintiff's
intestate.

There is no suggestion in the record of fault on the part of
the deceased.

The ruling of the Circuit Court in not sustaining the de-
murrer to the fourth count of plaintiff's declaration is assigned
as error.

It is contended that, while this count alleges that the defend-
ant was guilty of negligence in employing and retaining in its
service Brakeman Kegley, it does not allege that he was guilty
of any negligence which caused the accident that resulted in
plaintiff's intestate's death.

To hold a master liable for the negligence of incompetent
fellow servants, it must not only appear that the master neg-
lected to exercise the required care in the selection or retention
of the servant by whose negligence or incompetency the injury
was caused, but that the servant whose negligence caused the

injury was incompetent, and that the injury resulted from such incompetency. In other words, a master is not liable for injuries to one servant by the negligence or unskillfulness of another, on the ground of unskillfulness or incompetency of the latter, unless the injuries resulted from such unskillfulness or incompetency. Thus, unless the servant who is alleged to have been incompetent was negligent at the time of the injury, there can be no recovery on this ground. 12 Amer. & Eng. Enc. L. (2d ed.), 918, 919.

In *Kersey* v. *Railroad Company*, 17 Amer. & Eng. Railroad Cases, 638, the declaration alleged that plaintiff was injured while employed as a brakeman on defendant's railroad in coupling cars, and that the injuries resulted "from the mismanagement, carelessness, and negligence of the defendant, in allowing an engine to be managed by a fireman who was not fit or competent to perform the duties of an engineer, and whose incompetency was known to the defendant." The declaration was held to be fatally defective for the failure to aver that the fireman was guilty of some act of negligence or unskillfulness directly contributing to the injury. And in the case of *Thompson* v. *Railroad Company*, 84 Mich. 281, a declaration was held insufficient which alleged that the injury to the plaintiff, a railroad employee, was due to the incompetency of the engineer, but did not allege any act of the engineer constituting negligence.

It is not necessary to set out the particulars of the defendant's misconduct, but the plaintiff may set forth the cause of action in general terms, and aver that the injury was inflicted by the wrongful act, neglect, and default of the defendant—*Birckhead* v. *C. & O. Rwy. Co.*, 95 Va. 648. Still, when the cause of action is alleged to have been the carelessness or negligence of the defendant in employing or retaining in its service an unfit and incompetent servant, it is necessary to aver that the latter was guilty of some act of negligence or unskillfulness directly con-

tributing to the injury, otherwise the defendant would not be apprised of the facts that the plaintiff proposed to rely upon at the trial.

The objection to the fourth count of the declaration in this case was properly taken by demurrer, and the count should have been stricken out.

We are further of opinion that the Circuit Court erred in not sustaining defendant's objections to the questions propounded to plaintiff's witness, Beasley, as to the whereabouts of Conductor Davis on the occasion of this accident. It is not alleged in the declaration that the injuries to plaintiff's intestate were due to the absence of Conductor Davis, and therefore, evidence as to his absence from the "Betty Baker" mines on the occasion of this accident was wholly irrelevant.

The witness was asked also as to the use of the derailing switch in the siding at the mines in shifting cars, and as to the custom of the defendant in shifting cars at that place. To which questions and the answers thereto the defendant objected, the objection was overruled, and this is assigned as error.

Plaintiff was endeavoring to prove that the shift of the two cars that got away from Brakeman Kegley was being made in the usual way; that it could have been safely made had the defendant not been guilty of negligence in the performance of its duty to supply reasonably safe appliances with which to control the cars, and that the derailing switch had never been used while cars were being shifted, but the custom was to open it after the shifting was done and the train started to leave.

We can see no good reason why the plaintiff could not show that the accident was not due to a negligent shift of the cars, when to do so would add force and effect to other evidence introduced in support of the charge in the declaration that it was due to the negligence of the defendant in not providing, inspecting, and keeping in repair the brakes and other appliances on the cars. The evidence elicited from the witness Beasley by the ques-

tions objected to was entirely pertinent to that issue, and was, therefore, properly admitted.

The next assignment of error relates to the action of the court in giving certain instructions, and refusing others.

The first of the five instructions given for the plaintiff announced the proposition that it was the duty of the defendant to use ordinary care to furnish reasonably safe and suitable appliances for the performance of the duties imposed upon its employees in the service in which they are engaged, and told the jury that if they believed from the evidence that the defendant failed in the discharge of its duties as set forth, and its failure to do so was the proximate cause of the death of plaintiff's intestate, they should find for the plaintiff.

The second, that an employee, in entering upon a service, assumes the risks ordinarily incident to his employment, including the fault or negligence of a fellow-servant, and if the jury believed from the evidence that the defendant discharged its duty of using ordinary care to furnish reasonably safe appliances as set forth in Instruction No. 1, and further believe from the evidence that J. Kegley was the fellow-servant of plaintiff's intestate, and that the carelessness and negligence of. Kegley were the proximate cause of the death of the deceased, then they should find for the defendant.

And the third that, if the jury believed from the evidence that Brakeman Kegley was careless and negligent in the discharge of his duty, and that he was the fellow-servant of the deceased, yet if they further believed from the evidence in the case that the neglect of the defendant to discharge its duty in using ordinary care to furnish reasonably safe appliances and machinery, and its failure to use like care in keeping them in order, concurred with the carelessness and negligence of Kegley, as a proximate cause in producing deceased's death, they should find for the plaintiff.

These instructions announced propositions of law often ap-

proved by this court, and no special objection is made to them in the argument.

Plaintiff's fourth instruction, relating to the measure of damages, if the jury found a verdict for the plaintiff, among other directions to which no objection is made, told the jury that they might take into consideration the pecuniary loss of the widow and her children, "estimated upon the probable earnings of the deceased, considering his age, business capacity, experience, habits, energy, and perseverance during his probable life."

The objection urged to this direction is that there is no evidence as to the probable earnings of the deceased, his capacity, experience, energy and perseverance, nor proof of his wages, or of mortality tables.

The evidence is that deceased was thirty-eight years of age, had been for some time in the employ of the defendant as a section hand, and that his wages were sufficient to support a wife and eight children. With this evidence, and the further fact that the verdict under the circumstances of the case does not indicate that the jury were unreasonable in their estimate of damages, we do not think that the giving of the instruction is to be regarded as reversible error, but, as the case has, for other errors, to go back for a new trial, it would be better for the plaintiff to offer evidence more direct as to the probable earnings of the deceased, considering his age, business capacity, experience, habits, energy and perseverance, etc. We do not, however, regard it as essential that the mortality tables be proven in the case. These tables were made for the purpose of life insurance and annuities where the very shortest time is fixed as affecting pecuniary risks. They are regarded as falling short, in most instances, of the actual duration of human life. *Mulcairns v. City of Janesville*, 67 Wis. 37.

The fifth instruction is as follows: "They are further instructed, if they believe from the evidence that the "Betty Baker" mines, in Carroll county, was a terminal point of the de-

fendant company's road, and that at such terminal point the said
company had no repair shop or inspection force, or inspector;
but, instead thereof, by its rules, imposed upon the conductor and
brakeman the duty of inspecting cars before leaving there, and,
so far as they could, repair any defects in the machinery, so far
as they or either of them could do, in respect to such examina-
tion as was necessary, and such repairs as they or either of
them could do, such conductor and brakeman, and each of them,
were therein vice-principals in that matter, and negligence upon
the part of either of them was not the negligence of a fellow-
servant, but was the negligence of the company, and for any
injury resulting from such negligence the company is liable,
and notice to said brakeman, at said point, and while discharging
said duties, of defective machinery, was notice to the company;
and if, after receiving notice that the brakes were insufficient
and unsafe, the brakeman could have repaired one or both of
them, but failed negligently to do so, such failure to repair was
not the failure of a fellow-servant in contemplation of law, but
was the negligence of the company, and if such negligence was
the proximate cause, or one of the proximate causes of the acci-
dent that caused the death of the deceased, the company is liable
in damage therefor."

It is urged that this instruction is partly based on the erro-
neously assumed fact that the "Betty Baker" mines is a terminal,
and is also erroneous because it asserts the proposition that
Brakemen Kegley and McNew were not, because of the rules
of the defendant offered in evidence, fellow-servants of the sec-
tion men.

As there was no evidence in the case upon which the jury
might have found that "Betty Baker" mines was a terminal in
the sense that the defendant had, or should have had, an organ-
ized inspecting and repair force there as at a terminal in the true
sense of that term, and the only evidence on that point is to
the contrary, and uncontradicted, so much of the instruction as

referred to the "Betty Baker" mines as a terminal was misleading, and should have been stricken out.

Rule 116 of the defendant, with reference to the duties of brakemen in its employ, provides:

"They must examine and know for themselves that the brakeshafts and attachments, ladders, running boards, steps, handholds, and other parts and mechanical appliances which they are to use, are in proper condition; if not, put them so, or report them to the proper parties that they may be put in order before using."

Brakemen and other employees of a railroad company, when engaged in the work of mere operation, are unquestionably fellow-servants as to all engaged in that work, but where a brakeman or other servant of the company so engaged is by authority of the company performing a duty which a master is not permitted by law to delegate to another, he is placed in the category of principal or vice-principal, and the master becomes liable for an injury resulting to another servant from the negligence of the servant to perform, or in performing, the duty of the master.

An employer, whose duty it is to provide reasonably safe appliances, cannot escape liability for his negligence by employing incompetent or unsuitable persons to discharge it, or by showing that the negligence of a fellow-servant concurred with the negligence of the master to perform the duty of supplying, inspecting, and keeping in a reasonably safe condition appliances reasonably suitable for the work he requires to be done, which resulted in an injury to a fellow-servant.

The servant is not required to take the risk of the carelessness of those who undertake to discharge, under the master's rules or directions, the master's duty towards him, even if they are the servants of the same master. And where injury to a servant has been caused by the default of a fellow-servant concurring with the negligence of the master, the latter is liable as though he only were at fault. *Donnelly* v. *Granite Co.*, 90 Me. 110;

*N. & W. Rwy. Co.* v. *Nuckols,* 91 Va. 193; *Richmond Granite Co.* v. *Bailey,* 92 Va. 554; *N. & W. Rwy. Co.* v. *Ampey,* 93 Va. 108; *Houchin* v. *N. & W. Rwy. Co.,* 95 Va. 398.

"The servant does not agree to take the chance of any negligence on the part of his employer, and no case has gone so far as to hold, where such negligence contributes to the injury, that the servant may not recover. It would be both unjust and impolitic to suffer the master to evade the penalty for his misconduct in neglecting to provide properly for the security of his servant." *Noble* v. *Bessemer Steamship Co.* (Mich.), 86 N. W. Rep. 520, and authorities there cited; *N. & W. Rwy. Co.* v. *Ampey, supra.*

In this case, while plaintiff's intestate assumed the risks ordinarily incident to his employment, including the carelessness or negligence of a fellow-servant, he did not assume the risk of injury caused by the failure of the defendant to discharge its duty to inspect and keep in a reasonably safe condition the appliances to be used in the work of the department of his employment, and if the rules of the company put the duty on the train crew to inspect and repair the cars attempted to be shifted into the train at "Betty Baker" mines, on the occasion of the accident that caused the death of plaintiff's intestate, it was a non-assignable duty, and the negligence of the crew, or either of them, in the performance of that duty was the negligence of the defendant.

In *N. & W. Rwy. Co.* v. *Ampey, supra,* Rule 679 of the plaintiff in error—defendant in the lower court—came under review. It made it the duty of conductors of freight trains to see that the couplings and brakes of the cars of their trains were in good order before starting, and to inspect them when the train stopped for water, or for other trains.

In that case, Ampey, a brakeman on a freight train, was injured at Petersburg, not a terminal of the defendant company, while attempting, under the direction of the conductor, to couple cars, taken into the train, that had been injured in a

wreck. It was held that the defendant was, or ought to have been, aware of the condition of the drawheads and brakes on the cars; that it was its personal duty to have had them put in order, and it had not done so; that this was its own negligence, for which it was liable for a consequent injury to a servant whose duty required him to use them; that the conductor, under the rules of the defendant company, was its representative with respect to this matter, and his knowledge became in law the knowledge of his principal; that notice to the conductor, prior to the injury of Ampey, of the defective condition of the couplings on the cars, was notice to his principal, and his negligence, in not refusing to take up those cars as a part of his train, or in not taking the proper precaution to avoid the danger that was liable to arise from using the damaged couplings, &c., was the negligence of the company, for which it became liable for the injuries resulting to Ampey.

In this case, the evidence not only tended to prove negligence on the part of the defendant in sending out from Pulaski, where it had an organized force of inspectors, cars to be loaded with ore at "Betty Baker" mines which were not supplied with reasonably safe appliances required for their control in the use to be made of them, but to show that the defendant knew, or ought to have known, that the attempt to shift, in accordance with the usual custom, the cars from the tipple over the siding to its main line, at "Betty Baker" mines, would be attended with much risk of their getting beyond the control of brakemen handling them, and of running wild down the main line in the direction of "Betty Baker" station by force of gravitation, unless equipped for their control with sufficient brakes in safe working order.

The duty of inspecting and repairing these cars before attempting to shift them on to the siding was, by the rules of the defendant, entrusted to the crew of the train that was to carry them away, and in this instance this duty was entrusted to Brakemen Kegley and McNew, and their negligence, or that of

either of them, in the performance of that duty, was the negligence of the defendant, and not that of a fellow-servant. *N. & W. Rwy. Co.* v. *Ampey, supra*; *Houchins* v. *N. & W. Rwy. Co. supra;* 12 Am. & Eng. Enc. L. (2d ed.), 958, 959, 960.

One servant, however, may be, in relation to a co-servant, a vice-principal in one relation and a fellow-servant in another, depending on the particular duties he is discharging at the time. Whether he is the one or the other, must be determined by an enquiry into the nature of the service which he was performing at the particular time of his alleged negligence. *N. & W. Rwy. Co.* v. *Ampey, supra*; *Houchins* v. *N. & W. Rwy. Co., supra*; *The M. & O. R. R. Co.* v. *Godfrey*, 155 Ills. 78; 12 Amer. & Eng. Enc. L. 949.

The crucial test in this case is whether the defective appliances on the cars being used by the defendant was the proximate or a concurring cause of the accident complained of, or whether the sole proximate cause was the negligence of Brakeman Kegley, and, if his negligence, whether it was in the discharge of his duty as the *alter ego* of the defendant, or his negligence as a fellow-servant of the deceased. These were questions for the jury, and as plaintiff's instruction five undertook to submit the whole case to the jury and failed to do so, the instruction in this respect was also defective.

The defendant asked for 23 instructions, all of which, except Nos. 6, 11, 12, 14, 15, 19 and 22 were refused. This is assigned as error.

The defence relied on was that the sole proximate cause of the death of plaintiff's intestate was the negligence of Brakemen Kegley and McNew, fellow-servants of the deceased, and Instructions Nos. 1, 3, 4, 5, 7, 8, 17, and 20 sought to tell the jury that it was the duty of Brakemen Kegley and McNew, upon finding the brakes on the two cars that got away and killed the deceased not in working order, and hence insufficient to

control the cars when shifted into their train, to have opened the derailing switch on the siding, or to have shifted the cars by the use of the engine, and their failure to do the one or the other was negligence, and if their negligence in this respect was the immediate and proximate cause of the death of the deceased, it was the negligence of a fellow-servant of the deceased, and plaintiff could not recover.

It is true Conductor Davis testified that if he had been present he would have used the engine, on finding the brakes on the cars insufficient to control them, but there was no evidence tending to overcome that of plaintiff to the effect that the attempt to shift the two cars was in accordance with the known custom of the defendant in shifting cars at the "Betty Baker" mines, and that the derailer on the siding was never opened until the shifting of the cars to be taken away had been done, and the train carrying them had started on its journey.

Nor was there any evidence that Brakemen Kegley and Mc-New, or either of them, had authority to use the engine in shifting the cars. There was also uncontradicted evidence that Kegley did all that he could to stop the cars after they were put in motion.

These instructions were well calculated to confuse and mislead the jury, and were rightly refused.

Instructions Nos. 2 and 23 were also properly refused. They proceed upon the idea that the failure of Brakemen Kegley or McNew to examine the brakes was the negligence of a fellow-servant, and ignore the question whether or not the failure of the defendant to use ordinary care in providing suitable appliances for shifting the cars was a concurring cause of the cars getting away and killing the deceased, and as to whether the negligence of the brakemen was that of the defendant, or of a fellow-servant of the deceased.

Nos. 9 and 10, refused, are directly opposed to the views we

have already expressed in discussing plaintiff's Instruction No. 5, and were properly refused.

No. 13 asserts in substance that, if the defendant did its whole duty in exercising ordinary care to provide appliances, etc., and keeping them in repair, and notwithstanding this care on its part the accident happened, it was one of the risks incident to the service, and plaintiff could not recover. The instruction contained a sound proposition of law, and the refusal to give it cannot, as we think, be regarded as cured by the giving of another instruction merely stating that a servant assumes the risks incident to the service he enters.

The proposition of law contained in No. 16 was fully and clearly enunciated in other instructions given, and, therefore, there was no error in refusing to give it.

No. 21 told the jury that if they believed from the evidence that it was the duty of Conductor Davis to accompany the crew of his train to "Betty Baker" mines, on the day of the accident complained of in the declaration, and be present at the shifting and moving of the cars in the declaration mentioned, so as to direct the moving and shifting thereof, and that he was guilty of negligence in failing to do so, the defendant company is not liable for such negligence on the part of Davis.

Evidence that Conductor Davis was absent from his train when this accident occurred, was, as we have said, improperly admitted, and for the same reason it was proper to refuse Instruction No. 21.

The remaining assignment of error calls for an expression of opinion on the part of this court as to the weight of the evidence, which we prefer not to give, as the case is to go back for a new trial.

The judgment of the Circuit Court, for the reasons stated, must be reversed and annulled, the verdict of the jury be set aside, and the cause remanded for a new trial to be had in accordance with this opinion.

*Reversed.*