SALMONS v. NORFOLK & W. RY. CO.

(Circuit Court, S. D. West Virginia. June 1, 1908.)

No. 85.

1. MASTER AND SERVANT—INJURIES TO SERVANT—DECLARATION—ALLEGATIONS OF NEGLIGENCE.

A declaration in a federal court sitting in West Virginia, under the practice prevailing in that state, alleging that plaintiff's intestate, while in defendant's employ, was engaged in work and without fault on his part

was injured by defendant's negligence in causing a freight train to be run into and against a work train on which intestate was employed, by reason of which he was killed, sufficiently stated a cause of action justifying a recovery for any negligence of the defendant proved to have proximately caused the act producing the injury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34. Master and Servant, §§ 809–876.]

2. TRIAL—DEMURRER TO EVIDENCE.

Where both parties joined in a demurrer to the evidence, such demurrer admits the truth of all material evidence introduced on plaintiff's behalf, together with all inferences which may be fairly drawn therefrom, but only admits such evidence of the defendant as is not contradictory of plaintiff's evidence, so that plaintiff is entitled to judgment if the jury in any view of the evidence would have been legally justified in rendering a verdict for plaintiff.

3. COURTS—FEDERAL COURTS—RULES OF DECISION.

The question of the responsibility of a railroad corporation for injuries caused to or by its servants is one of general law in regard to which the federal courts are not bound to follow the decisions of the state courts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 977–980.]

4. MASTER AND SERVANT—INJURY TO TRAINMEN—TELEGRAPH OPERATOR—NEGLIGENCE—FELLOW SERVANTS.

Where the rules of a railroad company made a telegraph operator in charge of a block signal responsible for the operation of trains within his block, and gave such operator absolute authority to hold trains until the block was clear, such operator was a vice principal, and not a fellow servant, of a trainman killed in a collision by the operator's negligence in opening the block and permitting a train to proceed while the block was occupied by another train.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 495–499.]

5. SAME—ACTS OF TRAINMASTERS—AUTHORITY.

A railroad rule directed block signal operators not to permit a train to enter a block following a train in the same direction until the preceding train had been reported as having cleared the block station ahead, except by order of the superintendent. Another rule regulating trainmasters required them to take charge of the movement of the traffic, exercise supervision over the men employed on the trains and in the yard and station service, see that they understood and obeyed all rules, and suspend them when necessary for neglect of duty, and, in the case of detention of a train by accident or obstruction, go to the place, if necessary, and take general charge of clearing the road, etc. Held that, where an assistant trainmaster directed a block signal operator to permit a train to proceed before a train within the block had been reported as having cleared, whether the operator was justified in believing that such assistant trainmaster had authority to give such direction, and whether he was negligent in so doing, were for the jury.

## On Demurrer to Evidence.

Trespass on the case. On the 6th day of June, 1905, George Salmons, plaintiff's intestate, was a member of the crew of a work train known as "Extra No. 544," and with the other members of his crew was at work loading ties on a section of defendant's line of railway between two stations known as "Dingess" and "Hale," between which stations there was a long tunnel known as "Dingess Tunnel"; all of the section of track between the two stations, about 2¼ miles, being single track, without any side tracks save at the stations of Dingess and Hale. This work train entered this section of track from the west, passing Dingess, and went to work about the eastern portal of the tunnel

referred to. The train was in charge of Conductor Duis, who, in accordance with rules of the company, either left or sent a flagman to Dingess at the west end of the tunnel with written instructions to be delivered to conductors and enginemen of east-bound trains, notifying them of the position of this work train, near the east end of the tunnel and that the train would clear at Hale, and also sending a flagman with similar written instructions to Hale to notify conductors and enginemen of west-bound trains of the position of his work train. He also sent an additional brakeman to Hale to bring back word in the event that the train was desired to take the side track at Hale to permit the passing of a train. Both Dingess and Hale were telegraph stations with an operator on duty at each.

When the work train passed Dingess going east, the operator at that point, De Wit Crabtree, displayed to following trains from the west the red arm of his semaphore, signifying "danger! stop!" and purposed to so allow it to remain until he received from the operator at Hale the information that the work train had passed out of the "block," as the section between two telegraph stations is called in telegraphic parlance. Some time after this work train (extra No. 544) had passed into the block between Dingess and Hale, a following freight train, designated as "Second No. 70," approached Dingess from the west, and the engineman of that train, Mr. Fink, seeing the danger signal, had stopped or was in the act of stopping his train, when the semaphore signal was changed from the horizontal arm to nearly perpendicular. which latter position signifies a clear block. Mr. Fink, prior to receiving this semaphore signal, had received and signed the written message from Conductor Duis notifying him of the position of this work train, and which the flagman had presented to him. Engineer Fink of train "Second No. 70," on receiving the semaphore signal that the block was clear, proceeded on toward Hale and into Dingess Tunnel, of nearly a mile in length, and when near the eastern portal of the tunnel collided with the work train which was there at work loading ties. The work train had been cut in two for convenience in handling the ties, and two or three of the rear cars were standing within the portal of the tunnel, with a space of about 15 feet left between them and the remainder of the train to serve as a passageway for the men carrying the ties. Plaintiff's intestate was engaged in carrying a railroad tie through this passageway when the cars that were within the portal of the tunnel were violently struck by the train known as "Second No. 70," and being propelled eastwardly caught him between them and the remainder of the train and so badly crushed and injured him that he died within two or three hours thereafter.

In order to explain how second No. 70 came to get the signal that the block was clear, it is necessary to recur to the situation at Dingess when second No. 70 was stopping in obedience to the signal of the semaphore. Mr. W. O. Franklin, assistant trainmaster of the defendant company over a jurisdiction at that time extending from Williamson, W. Va., to Portsmouth, Ohio, and embracing the territory between Digness and Hale, happened to be at the telegraph office at Dingess, and, observing that this train had stopped or was stopping, he asked the operator, Crabtree, why he was holding the train. The operator told him that the work train was in the block between there and Hale, and Mr. Franklin asked him if the work train had sent back a flagman, to which he replied "Yes," and Mr. Franklin then said, "Let them go, that they would look out for that," and, as Crabtree states in his testimony, "I pulled the block down, and the train proceeded." He further explained that he did this on Mr. Franklin's authority, and that he then thought that Mr. Franklin had authority to permit him (or direct him) to let the train go ahead.

A large number of the rules of the defendant company were introduced in evidence. Many of them have no very direct or immediate bearing on any question here to be discussed; but the following rules or portions of rules may have. Rules Nos. 41 and 50 were introduced by the plaintiff. Rule 41, under the heading "Trainmasters," reads as follows:

"No. 41. They report to, and receive their instructions from the superintendent. It is their duty to take charge of the movement of the traffic;

exercise supervision over the men employed on the trains, and in yard and station service, see that they understand and obey the rules and suspend them when necessary for neglect of duty; in case of detention of train by accident or obstruction, go to the place, if necessary, take general charge of clearing the road, and see that proper precautions are taken to insure the safety of the trains and property. They must also perform such other duties as may be assigned to them."

In connection with this rule, it was testified by Mr. Franklin that his duties as assistant trainmaster were those mentioned in the rule 41, and that on the section of road under his jurisdiction he was the only assistant train-master working under and in conjunction with R. P. Johnson, the trainmaster.

The plaintiff also offered in evidence rule No. 50, as follows:

### "Train Dispatchers.

"No. 50. Chief dispatchers report to and receive their instructions from the superintendent. They will obey the instructions of trainmasters as to road service, and the superintendent of telegraph as to telegraph and telephone service."

The defendant introduced in evidence the special rules printed on the time-table in force on the day of the accident (except Nos. 513, 535, and 541) from 501 to 542, inclusive, comprising "Rules Governing the Operation of Block Signals," and which were shown to be in force and applicable at the time of this accident. I quote the following as being specially in point, and explanatory of the situation:

### "Instructions to Train and Engineer.

"No. 501. Taking effect upon date to be fixed by special order, trains will be governed in their movements by a block system designed to protect trains running in an opposite as well as in the same direction. This system will be independent of the General Rules governing train movement and the move-ments directed by special telegraphic orders, and must not be confused there-with.

"No. 502. The section of main track between two telegraph stations is termed a 'block.' A 'block' station is a telegraph station where signals are displayed directing train movements.

"No. 503. The form of signal to be used is the double-arm semaphore, con-sisting of a mast with two arms near the top, one on each side, except as stat-ed in rule 514. A horizontal position of the arm, or a red light displayed signifies danger—stop. A nearly vertical position of the arm, or a white light signifies clear—go ahead. The right hand arm to a train approaching governs a train moving in that direction. The normal position of these signals will be at danger where they will remain except when held at clear by the hand of the operator. A block signal at danger must never be passed until the proper authority, in the form of a 'Permissive Block Card' or a clearance has been obtained from the operator, except as stated in rule No. 514.

"No. 504. An 'absolute block' means that but one train will be permitted to use the track between any two block stations at the same time."

(It was in evidence that the block between Dingess and Hale was an "abso-lute block.")

"No. 505. A 'permissive block' is used when trains are permitted to enter a block under notice that the preceding train has not cleared the same block. This is to be used only by direction of the superintendent, except as provided in rule No. 514."

(It is conceded that rule 514 has no application, as it was provided for stations having a "permissive block arm painted green"; no such appliance be-ing provided at Dingess.)

"No. 506. The block signals will be used for train orders, and all rules ap-plying to train order signals will apply to the block signals when used for train orders."

"No. 510. When a train approaches a block signal and it is changed to 'clear,' it will indicate that the block is clear to the first outer switch of the next station ahead. If the signal is at danger, it will indicate that the block is occupied by other trains, or that there are train orders."

"No. 518. These block rules will supersede all rules for the operation of block signals heretofore issued."

## "Instructions to Operators.

"The responsibility of operating the block system is placed upon the operators at the block stations, who will be governed by the following rules:

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"No. 527. Operators \* \* \* will not permit a train to enter a block following a train in the same direction until the preceding train has been reported as having cleared the block station ahead, except by order of the superintendent."

After the defendant had introduced its evidence, and both sides had rested, the defendant in writing demurred to the evidence introduced by the plaintiff, and the plaintiff in writing joined in said demurrer, and thereupon the jury returned its verdict in the following words and figures:

"If the court should be of the opinion that the law of the case upon the defendant's demurrer to the plaintiff's evidence should be for the plaintiff, then we, the jury, find for the plaintiff, and assess his damages at $6,000.00; but, if the court should be of the opinion that the law upon said demurrer to the evidence is for the defendant, then we find for the defendant.

"J. S. Ashworth, Foreman."

J. H. Meek, J. S. and J. R. Marcum, and Lace Marcum, for plaintiff.
Holt & Duncan, for defendant.

KELLER, District Judge (after stating the facts as above). This case, as will hereinafter appear, is a very important one, in that it presents some questions which have seldom, if ever, been directly passed upon by the Supreme Court of the United States, and also because it is to be decided upon a demurrer to the evidence of the plaintiff.

The declaration in the case, after making the necessary jurisdictional averments, charges: That the defendant was the owner and occupier of a line of railroad from the city of Norfolk, Va., to Kenova, in the Southern district of West Virginia; that plaintiff's intestate, George Salmons, was in the employ of defendant, engaged on one of its work trains near Dingess Tunnel; and that while so engaged at work, and without fault on his own part, defendant negligently caused a freight train to be run into and against the work train upon and about which plaintiff's intestate was at work, by reason of which he was killed.

Under the practice prevailing in Virginia and West Virginia, the declaration contained a sufficient statement of the cause of action, and any negligence of the defendant made to appear by the evidence as proximately causing the act producing the injury is sufficiently pleaded by such a declaration. Norfolk & W. Ry. Co. v. Phillips' Adm'x, 100 Va. 362, 41 S. E. 726; Snyder v. Wheeling Electrical Co., 43 W. Va. 661, 28 S. E. 733, 39 L. R. A. 499, 64 Am. St. Rep. 922.

In the argument before me it was admitted that the plaintiff's intestate was at his post of duty and without fault on his part when he was killed, and that his death was the result of negligence; but the plaintiff contends that the negligence was, in law, attributable to the defendant, whereas the defendant contends that the negligence proximately causing the injury was that of a fellow servant of plaintiff's intestate, for which the defendant is not liable. As this case is standing upon a demurrer to the evidence of the plaintiff, and such demur-

rer admits the truth of all material evidence introduced on behalf of the plaintiff, together with all inferences which may fairly be drawn therefrom, and only admits such evidence of the defendant as is not contradictory of plaintiff's evidence, we must examine the evidence in this case with a view of determining whether or not there was any evidence, together with fair inferences to be drawn therefrom, upon which, if submitted to a jury, they would, in any view of it, have been legally justifiable in returning a verdict for the plaintiff. If such can be found in the record, I must enter judgment for the plaintiff; if not, for the defendant. Heard v. Railroad Co., 26 W. Va. 455; Levy v. Insurance Co., 10 W. Va. 560, 27 Am. Rep. 598.

Before passing to a discussion of the questions involved, I may point out that counsel for the defendant did not agree as to the causal act of negligence in this case; one of counsel (Mr. Duncan) insisting that it was the act of Engineer Fink in proceeding carelessly with his train after having received information from the flagman of the work train that said train was in the block near the east portal of the tunnel, and contending that, such being the case, the negligence was clearly that of a fellow servant, and hence there can be no recovery. In answer to this, it is sufficient to point out that the jury might not have found that Engineer Fink was negligent in proceeding as he did after receiving the written order from the flagman of "Extra 544," because he thereafter received the signal that the block was clear, and under rule 510, introduced in evidence, this was an indication that the block was clear, and might well be held by the jury to have superseded the information communicated to him by the message of the flagman. The other counsel for defendant insisted: That the negligence in this case which proximately caused the injury was that of the Telegraph Operator Crabtree in signaling to second No. 70, the train of which Mr. Fink was engineman, that the block between Dingess and Hale was clear; that, in so signaling, Crabtree was the fellow servant of Salmons, the plaintiff's intestate; and hence that there can be no recovery.

On behalf of the plaintiff, it is insisted: First, that the telegraph operator, Crabtree, in so far as his duties were laid down as to block signals, was not the fellow servant of plaintiff's intestate, but the direct representative of the railway company in regard to those matters, and invested with a duty of the master which is nonassignable; and second, that, under the rules of the company, W. O. Franklin, assistant trainmaster, was a representative of the master, and that his negligence in directing or advising the operator, Crabtree, as to his course of action in the premises, directly contributed to the injury, and that hence the master is responsible in damages.

The first of these contentions involves the consideration of the general relation of master and servant, and of the proper interpretation of the doctrine under which the master is exempt from liability for injury to his servant where the proximate cause of the injury is the negligent act or omission of a fellow servant.

## Who are Fellow Servants?

The importance of determining upon correct principles the question who are fellow servants within the definition of those for whose negli-

gence the master is exempt is paramount. That it does not necessarily embrace all of the employés of the common master has been long well settled; but the courts have ever been averse to an attempt to lay down any hard and fast rule applicable to all cases, because all the circumstances of the particular case decided must necessarily enter into and affect its decision. As stated by the court in Hough v. Texas & Pacific R. Co., 100 U. S. 213–226, 25 L. Ed. 614:

"As to the general doctrine (of assumption of risks including negligence of fellow servant) to which we have adverted, very little conflict of opinion is to be found in the adjudged cases, where the court has been at liberty to consider it upon principle, uncontrolled by statutory regulations. The difficulty has been in its practical application in the special circumstances of particular cases."

Coming now to some of these particular cases, let us see what the courts have held, and, if we can, why they have so held:

In the case just adverted to (Hough v. Railway Co., 100 U. S. 213, 25 L. Ed. 612), the court says:

"A railroad corporation may be controlled by competent, watchful, and prudent directors, who exercise the greatest caution in the selection of a superintendent or general manager, under whose supervision and orders its affairs and business in all of its departments are conducted. The latter, in turn, may observe the same caution in the appointment of subordinates at the head of the several branches or departments of the company's service. But the obligation still remains to provide and maintain, in suitable condition, the machinery and apparatus to be used by its employés, an obligation the more important, and the degree of diligence in its performance the greater, in proportion to the dangers which may be encountered. Those, at least, in the organization of the corporation, who are invested with controlling or superior authority in that regard represent its legal personality; their negligence, from which injury results, is the negligence of the corporation. The latter cannot, in respect of such matters, interpose between it and the servant, who has been injured without fault on his part, the personal responsibility of an agent who, in exercising the master's authority, has violated the duty he owes, as well to the servant as to the corporation. To guard against misapplication of these principles. we should say that the corporation is not to be held as guaranteeing or warranting the absolute safety, under all circumstances, or the perfection in all of its parts, of the machinery or apparatus which may be provided for the use of employés. Its duty in that respect to its employés is discharged when, but only when, its agents whose business it is to supply such instrumentalities exercise due care as well in their purchase originally, as in keeping and maintaining them in such condition as to be reasonably and adequately safe for use by employés."

These views, which surely embody the most profound logic, are sustained by such leading cases as Ford v. Railroad Co., 110 Mass. 241, 14 Am. Rep. 598; Coal Co. v. Reid, 3 Macq. H. L. Cases, 266; Coal Co. v. McGuire, 3 Macq. H. L. Cases, 307; and many others.

In the case of Clarke v. Holmes, 7 Hurls. & N. 937, decided in the Exchequer Chamber upon appeal from the Court of Exchequer, Byles, J., made this pertinent remark:

"Why may not the master be guilty of negligence by his manager or agent. whose employment may be so distinct from that of the injured servant that they cannot with propriety be deemed fellow servants? And if a master's personal knowledge of defects in his machinery be necessary to his liability. the more a master neglects his business and abandons it to others, the less will he be liable."

In accordance with these views, the Supreme Court of the United States has held, in Northern Pacific Railroad Company v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, 29 L. Ed. 755, that:

"It is the duty of the employer to select and retain servants who are fitted and competent for the service, and to furnish sufficient and safe materials, machinery, or other means by which it is to be performed, and to keep them in repair and order. *No duty required of him for the safety and protection of his servants can be transferred so as to exonerate him from liability.*" (Italics mine.)

To the same effect as to furnishing suitable machinery and appliances, see Hough v. Texas & Pacific R. R. Co., supra.

"A railroad company is not excused from its duty to inspect its cars by the sufficiency of the number of its inspectors and their competency. It is the duty of a railroad company to see to it that the wheels of its cars which are about to be drawn out on its road are in safe and proper condition, and this duty cannot be delegated so as to exonerate the company from liability to its servants for injuries caused by an omission to perform that duty, or by its negligent performance." Union Pacific R. Co. v. Snyder, 152 U. S. 684, 14 Sup. Ct. 756, 38 L. Ed. 591.

"A railroad company is under a legal duty not to expose its employés to danger arising from such defects in foreign cars as may be discovered by reasonable inspection before such cars are admitted to its train." Baltimore & P. R. Co. v. Mackey, 157 U. S. 72, 15 Sup. Ct. 491, 39 L. Ed. 624; Texas & P. R. Co. v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188.

If the case at bar could be considered as being settled by the decisions of the highest appellate court of the state, the matter would present no difficulty, as the Supreme Court of Appeals of West Virginia has twice decided that a telegraph operator in charge of the signals at a station is not a fellow servant of an employé on one of the railroad company's trains. This was first held in Haney v. P., C., C. & St. L. Ry. Co., 38 W. Va. 570, 18 S. W. 748, and subsequently in the case of Flannegan v. Chesapeake & O. Ry. Co., 40 W. Va. 436, 21 S. E. 1028, 52 Am. St. Rep. 896. The circumstances of this latter case were, in some respects, singularly like those in the case at bar. In the Flannegan Case, a freight train on which the plaintiff was engaged at work as a brakeman became uncoupled in what was known as "Sretchers' Neck Tunnel," and it became his duty to couple it. The conductor sent the rear brakeman back to flag any approaching train. The trains were run through this tunnel by the so-called "block system"; there being a telegraph station at each end of the tunnel. The operator at the west end of this tunnel gave a following passenger train the wrong signal—being that for a clear track—and allowed it to proceed at full speed, when she should have stopped it. Held, that the telegraph operator in charge of a signal station who has control, by means of signal orders, of the running of trains over a block section of a railroad, is not the fellow servant of a brakeman injured on such block section by reason of such operator's negligent management of the running of such trains. In considering the question involved, the court, in its opinion, says:

"Two persons who are called upon to perform the same duty, in effect, may occupy a relatively different position to the same employé in its discharge. For instance, the flagman protects his co-employés by warning the approaching train, while the master, the dispatcher, and the operator render them the same protection by not allowing the train to use the track until it is clear. One stops the train; the other holds it back. The one is a part of the train, while the other belongs to an entirely different department, which has the supervision and management of all trains, and yet is no part of any train, but is entirely stationary. The one acts for self-protection; the other being in no personal danger, acts for the safety of others, and the dispatch of his master's business. In this case the defendant, seeking to discharge its personal duty and provide a safe track, and at the same time facilitate the rapid movement of trains, established the signal station, and placed the operator in charge, with full authority by means of a code of signal orders equally as effective as any other kind could possibly be, to control the running of all trains over this block; and all trainmen, of every train, were under absolute rule to watch for and obey her orders before they dare enter upon the block. If she had been attentive to her duties, she must have known the block was occupied and obstructed, and her knowledge was the knowledge of the master. Yet, in the face of that fact, she negligently gives a peremptory signal for the train to proceed. In what way could she possibly be the fellow servant of the trainmen, who are entirely at her command, and who can neither influence or control her independent actions? She is as much the master of her section block as the master is of the whole road. In Lewis v. Seifert, 116 Pa. 647, 11 Atl. 519, 2 Am. St. Rep. 631, it is held: 'The master owes to every employé the duty of providing a reasonably safe place in which to work. This is a direct personal and absolute obligation, and, while the master may delegate these duties to an agent, such agent stands in the place of the principal, and the latter is responsible for the acts of the agent. And where the master or superior places the entire charge of his business, or a distinct branch of it, in the hands of an agent or subordinate, exercising no discretion or oversight of his own, the master is held liable for the negligence of such agent or subordinate.'"

Undoubtedly, were the decisions of the state courts of last resort binding upon the federal courts within their jurisdiction, this decision and that in the case of Haney v. P., C., C. & St. L. Ry. Co., supra, would conclude this case; but as held in B. & O. R. R. Co. v. Baugh, 149 U. S. 369, 13 Sup. Ct. 915, 37 L. Ed. 772:

"The question of the responsibility of a railroad corporation for injuries caused to or by its servants is one of general law, in regard to which this court is not bound to follow the decisions of the state court." Point 2 of syllabus.

"The thirty-fourth section of the Judiciary Act of 1789 is limited in its application to the positive statutes of the state, and the construction thereof adopted by the local tribunal, and to rights and titles to things having a permanent locality." Point 3 of syllabus.

The question as to whether a telegraph operator is a fellow servant of an injured trainman has, so far as I am aware, only been before the United States Supreme Court on two occasions. The first was the case of Price v. Detroit, G., H. & M. R. Co., 145 U. S. 651, 12 Sup. Ct. 986, 36 L. Ed. 843, which was originally decided in the Circuit Court of the United States for the Eastern District of Michigan by Judge Henry B. Brown, who at the time of the hearing of the case in the Supreme Court was a member of that body, and consequently did not participate in the decision of the case, which was affirmed by a divided court. The facts in that case were that a west-bound train, known as "No. 11," had arrived at a station named "Lowell," where one Taft

was employed as local telegraph operator, and, while said train was still at Lowell engaged in switching cars preparatory to continuing its journey west, Taft received a telegraphic order from the train dispatcher at Detroit directing him to detain this train at Lowell until a certain east-bound train, known as "No. 82," on which the plaintiff's intestate was the engineer, arrived at Lowell, at which point the two trains were to meet and pass each other. This order Taft did not deliver to the conductor of No. 11, as was his duty, nor did he in any manner inform the conductor or engineer of its reception.

The other case decided by the Supreme Court of the United States is that of Northern Pacific R. Co. v. Dixon, reported in 194 U. S. 339, 24 Sup. Ct. 683, 48 L. Ed. 1006, in which the material facts were that the operator at Bonita, whose duty it was, under a rule of the company, to "record in a book to be kept for the purpose, and report to the superintendent, the time of arrival and departure of all trains, and the direction in which extra trains are moving," was asleep when extra freight train No. 162, going east, on which plaintiff's intestate was a fireman, arrived at his station at 12:35 a. m. and when it left at 12:50 a. m. Another extra freight, No. 159, was at the time moving westward toward No. 162 on a single track, and at 1:05 a. m. reached a station named Garrison, about 48 miles east of Bonita, and its arrival was reported to the train dispatcher, who thereupon asked the operator at Bonita whether No. 162 had arrived there, and the operator promptly answered that it had not. The question was repeated, and the operator asked if he was sure that No. 162 had not passed Bonita, and, upon his repeated assurance that it had not, the train dispatcher issued orders for the movement of these two trains, which were sufficient to guard against collision if the information received had been correct; but, as it was not correct, the movement resulted in a collision and the death of plaintiff's intestate. Upon these facts, the Circuit Court of Appeals of the Eighth Circuit certified the following questions:

"First. When a local telegraph operator is called upon specially by a train dispatcher to give information relative to the arrival of a train at his station, to enable the dispatcher to formulate orders for the movement of other trains, does the local operator, in the matter of giving such information, act as a fellow servant of train operatives in such sense that the master is not liable to train operatives who are injured by obeying an erroneous order of the dispatcher that was induced by false information given by the local operator?

"Second. Is the negligence of a local telegraph operator and station agent of a railway company in observing and reporting by telegraph to the train dispatcher the movement of trains past his station, which causes the injury or death of a fireman of the company, without any fault or negligence of the train dispatcher, the negligence of a vice principal, for which the railway company is liable in damages to the fireman or his personal representatives, or is it the negligence of a fellow servant of the fireman, the risk of which the latter assumes?"

The Supreme Court (against the dissent of four of the justices) answered these questions as follows:

"First. The telegraph operator was, under the circumstances described, a fellow servant of the fireman.

"Second. The negligence of the telegraph operator was the negligence of a fellow servant of the fireman, the risk of which the latter assumed."

With regard to the case of Price v. Detroit, G., H. & M. R. Co., it is sufficient to say that the decision, being by a divided court, was not authority beyond the case under consideration.

In the Dixon Case, it will be observed that the answers to the questions certified by the Circuit Court of Appeals were carefully limited to the circumstances of the particular case, and were answered with reference to those circumstances. Undoubtedly, this Dixon Case, notwithstanding the strong dissent thereto of four justices of the Supreme Court, is binding authority upon the inferior federal courts as to all cases in which the circumstances are the same, and unquestionably holds that, as regards the duty of furnishing to the master informatic.. in regard to events transpiring at his station, the local operator is a fellow servant of trainmen who may be affected by the inaccuracy of such information; but I do not understand the decision as authority for the proposition that in no conceivable case can the local telegraph operator so represent the master as that his negligence may be imputed to the master. As the facts and circumstances in the case at bar are different from those in the Dixon Case, I feel impelled to state at some length wherein I find matter of distinction between the two cases. In the Dixon Case, and many similar cases decided by the Circuit Courts and Circuit Courts of Appeal, including Ill. Cent. R. Co. v. Bentz, 99 Fed. 657, 40 C. C. A. 56, B. & O. R. Co. v. Camp, 65 Fed. 953, 13 C. C. A. 233, Oregon Short Line & U. N. Ry. Co. v. Frost, 74 Fed. 965, 21 C. C. A. 186, and others, the duties performed by the local telegraph operator were those usually appertaining to telegraphic train orders, including the duty of reporting the arrival and departure of trains, and the delivery to the proper trainmen of telegraphic train orders received by the operator for the movement of trains passing his station, and therefore may be well said to be those of a subordinate purveyor of information both to and from headquarters. This precludes the idea of the operator being clothed with any authority of direction to trains or trainmen except in obedience to special instructions in the particular case received from superior authority.

In the case at bar, we are dealing with a different sort of duty under a different system, viz.: The block signal system, in which the responsibility and the employment of the operator are, in my judgment, different from the ordinary duties of a local telegraph operator as stated in the Dixon and similar cases. By this block signal system the track of a railroad company is divided into blocks, a block comprising that portion of the track between two telegraph stations each of which is provided with a semaphore consisting of a perpendicular mast with two arms, one projecting from each side of the mast when in normal position. The approaching train is governed in its movement by that arm of the semaphore which extends toward the right as viewed by the men on the train, and its normal position (horizontal) signifies "danger! stop!" which position it must and will occupy except when held at nearly vertical or "clear" by the hand of the operator, which

latter position signifies to the trainmen that the block is unobstructed to the first outer switch of the next station ahead. See rules introduced in evidence by the defendant.

By rule No. 506 (quoted in the statement preceding this opinion) addressed to trainmen, it is provided that:

"The block signals will be used for train orders, and all rules applying to train orders signals will apply to the block signals when used for train orders."

Coming immediately after rule 518 as it appears in the record, and before rule 519, is the following language:

"Instructions to Operators.

"The responsibility of operating the block system is placed upon the operators at the block stations, who will be governed by the following rules: * * *"

The rules which then follow make it clear that the operator is invested with the authority of displaying the proper signals governing the operations of the trains within his block without any special instructions relative to the particular case. As a matter of course his duties require him to obey all appropriate rules, and, in a case like the one at bar, to procure from the superintendent an authority to issue a "permissive block card" before permitting a following train to enter an "absolute block" which contains another train; but nevertheless the promulgation of all train orders for his block originates with him, and he must be, in my judgment, the representative of the master as to train orders upon that block, else the master has no representative for that service.

To illustrate what I mean, let us take the case at bar: When second No. 70 approached, the operator made the signal "danger! stop!" This was the correct signal under the rules, and was being obeyed by the trainmen. The operator had not only the right, but it was his duty, to give this signal under the rules without any communication whatever with the superintendent or any other higher authority. He was invested with this duty and responsibility by the rules of the company adopted for the operation of block signals, and he was made responsible for his block by those rules, and that signal to stop was the signal of the master. The trainmen were bound to obey it at their peril, although they knew it had not been telegraphed to the local operator from headquarters, but originated with him. Prior to the installation of the block system, the local operator would have had no right to stop this train except by virtue of orders originating in the superintendent's or dispatcher's office. Now he has the right and the duty to do so. So he has the power under the rules to direct this train to proceed with the assurance to the trainmen that the block is clear to the first outer switch of the next station ahead. He does so. Whose is that order? Had the track been clear, it would have been the valid order of the master, promulgated by the only means prescribed by the rules.

The master cannot delegate power to issue orders (not to repeat them, but to issue them) without assuming the responsibility for their correctness where they relate to such a matter as the protection of the safety of his employés at their place of work.

In the exhaustive opinion in the case of Baltimore & O. R. Co. v. Baugh, 149 U. S. 387, 13 Sup. Ct. 914, 37 L. Ed 781, the court quotes, with approval from the opinion of Mr. Justice Valentine in the case of Atchison, T. & S. F. R. Co. v. Moore, 29 Kan. 632, 644, a portion of which quotation is as follows:

"A master assumes the duty toward his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work, with reasonably safe machinery, tools, and implements to work with, with reasonably safe materials to work upon, and with suitable and competent fellow servants to work with him, and, when the master has properly discharged these duties, then, at common law, the servant assumes all the risks and hazards incident to or attendant upon the exercise of the particular employment or the performance of the particular work, including those risks and hazards resulting from the possible negligence and carelessness of his fellow servants and co-employés. And at common law, whenever the master delegates to any officer, servant, agent, or employé, high or low, the performance of any of the duties above mentioned, which really devolve upon the master himself, then such officer, servant, agent, or employé stands in the place of the master, and becomes a substitute for the master, a vice principal, and the master is liable for his acts or his negligence to the same extent as though the master himself had performed the acts or was guilty of the negligence."

I am of opinion that, under the particular circumstances of this case, the telegraph operator, Crabtree, in the operation of the block signal system under the rules introduced in evidence, was performing a positive duty of the master in relation to the movement of trains within his "block," and that there was sufficient evidence of his negligence to be submitted to the jury for their determination as to its existence and as to whether or not it was the proximate cause of the injury.

## Did the Negligence of Franklin, the Assistant Trainmaster, Concur with That of the Operator?

The plaintiff contends that, even if it should be held that the telegraph operator, Crabtree, was a fellow servant of the plaintiff's intestate, his negligent act was the result of the direction of a man who had wide authority over him, and who was, undoubtedly, as he claims, the representative of the master in and about the movement of trains over a large part of the master's road, including the block in which the accident occurred, and insists that, if the negligence of the assistant trainmaster, Mr. Franklin, concurred with that of the operator, the company is responsible in damages.

The plaintiff predicates the view of the case at present under consideration upon rules Nos. 41 and 50, introduced by him in evidence. Rule No. 41 does seem to give a wide authority to trainmasters in relation to the movement of traffic. Under that rule, it is made their duty to "take charge of the movement of the traffic; exercise supervision over the men employed on the trains, and in yard and station service, see that they understand and obey the rules, and suspend them when necessary for neglect of duty; in case of detention of train by accident or obstruction, go to the place if necessary, take general charge of clearing the road, and see that proper precautions are taken to insure the safety of the trains and property.".

This is surely a large delegation of authority, and it is evident that both Mr. Crabtree, the operator, and Mr. Franklin, the assistant trainmaster, understood it as authorizing the direction or advice under which the former acted on the day of the accident. Mr. Franklin stated on the stand that his duties and powers as assistant trainmaster were the same as those prescribed in the rule for trainmasters. Unquestionably, if I can understand the English language, this rule gave Mr. Franklin large authority over Crabtree. Crabtree was in station service, and under this rule, if 1 read it aright, might have been suspended by Mr. Franklin for neglect of duty. It was Franklin's duty to see that he understood and obeyed the rules, so far at least as related to the movement of traffic. In the event of detention of train by accident or obstruction, it was his duty to go to the place, if necessary, "take general charge of clearing the road, and see that proper precautions are taken to insure the safety of the trains and property."

I am frank to say that I think the rule No. 527, directing block signal operators not to permit a train to enter a block following a train in the same direction until the preceding train has been reported as having cleared the block station ahead, except by order of the superintendent. is perfectly clear and easily understood, and that one charged with the duties of a block signal operator should understand that such a rule is inviolable save by the authority therein named.

At the same time, where the act of one so far representing the master as to be charged with the duty of seeing that train, yard, and station employés understand and obey the rules, and having power to suspend them for neglect of duty, induces the violation of a rule by one of a class employés he is given power to supervise and suspend, and the violation of that rule was the proximate cause of injury, I think the question as to whether his negligence directly contributed to the injury is a proper one to be submitted to the jury.

The question is not, to my mind, determinable by inquiring whether or not Franklin in fact had the authority to suspend or modify the rules of the company in such a case, but whether he was, as to the control of the movement of traffic over that part of the road, a vice principal of the master, whether he was negligent, and whether his negligence, co-operating with that of a fellow servant of plaintiff's intestate, contributed to cause the injury. This inquiry is entirely unimportant, if I am correct in my view that, as to block signal service, Crabtree was not a fellow servant of plaintiff's intestate. and only becomes important upon the assumption that he was such fellow servant, here indulged for the sake of presenting this point. The master remains liable where the injury complained of was caused partly by a co-servant's disregard of rules, and partly by the negligence of the master himself or of some employé for whose omissions of duty he is responsible. Louisville, N., A. & C. R. Co., v. Heck, 151 Ind. 292, 50 N. E. 988. As I have already said, this phase of the case is unimportant, in view of the fact that I hold that, in the performance of his duties in relation to the operation of the block signal system, Crabtree was not the fellow servant of trainmen within his block, but the representative of the master, and I have merely adverted to it because it was presented

in argument as an alternative proposition in the event it was held that Crabtree was a co-servant of plaintiff's intestate.

Having held that, under the circumstances of this case, the block signal operator, Crabtree, was not the fellow servant of plaintiff's intestate, I must hold that there was sufficient evidence of defendant's negligence to have been properly submitted to the jury, and the defendant's demurrer to the .plaintiff's evidence will therefore be overruled, and judgment will be entered for the plaintiff upon the verdict of the jury.