ANNIE ONDIS' ADMINISTRATRIX, DEFENDANT IN ER-
ROR, v. THE GREAT ATLANTIC AND PACIFIC TEA
COMPANY, PLAINTIFF IN ERROR.

Argued June 26, 1911—Decided November 20, 1911.

1. When the place, assigned by the employer to his employe to
   work, is safe for him while certain machinery, with which he
   is obliged to come in contact and over which he has no control,
   is at rest, but is liable to become a place of great peril to him
   the instant such machinery is started in motion, and a previous
   method of warning him of such starting had been uniformly pur-
   sued by the employer through the act of another employe, who
   was in control of the machinery and had undertaken the duty
   of giving such warning, the neglect of the latter to give the
   warning is legally imputable to the employer.
2. Such employes are not to be regarded in law as fellow-servants
   engaged in a common employment.

On error to the Hudson County Circuit Court.

For the plaintiff in error, *Griggs & Harding.*

For the defendant in error, *McDermott & Enright.*

The opinion of the court was delivered by

VREDENBURGH, J.   Ondis, the plaintiff's intestate, was at
work for the defendant in an uncovered pit or trench, about
five feet deep from the surface of the ground under the side-
walk curb adjacent to its warehouse premises, in Jersey City,
and was killed by the sudden revolution of a powerful screw
under his feet, which, in revolving, caught his legs and cloth-
ing, and almost instantly tore off his feet.

The deceased was engaged, in obedience to the orders of
Mr. Parker, the superintendent of construction and machinery
of the company, in bailing water from the bottom of the pit
in which he stood, by reaching down and filling pails with
water which he then handed up to Mr. Parker who was within
his reach upon the adjoining bank.   In order to retain his
footing so as to accomplish this work, he stood within the pit,

either upon, or very close to, this screw, which was then stationary, and partly enclosed in a U-shaped iron trough, underneath the screw, and in which, when in motion, the screw turned. The screw was revolved by electrical motors operated and controlled from a switch board by the engineer, in his engine-room, at a distance (not stated in the evidence) away from the pit, but completely out of the sight of any person whether standing in the pit or on the bank adjoining it. Neither the engineer, while in his engine-room, nor the employe, while in or at the pit, could see each other, nor was there any mechanical or other means of signaling between them.

The place in the pit where Ondis stood, while bailing the water, was entirely safe so long as the electrical power was off, and the machinery and screw consequently were at rest, but the instant the power was turned on and the screw revolved, his position became one of immediate peril to his life. It is clear from the engineer's testimony that he was fully aware this machinery could not be started without extreme danger of fatal consequences to the man in the pit. This knowledge that officer expressly admitted. By these admissions it appears that Ondis had, on occasions previous to the accident, worked in the pit; the engineer testified that on these occasions he would always find out where Ondis was before he would start the machine; that if Ondis was bailing water, when he got through with his job, he (Ondis) would either come from the pit and tell him (the engineer) that the water was all out, or if not, that he himself would go out and see Ondis, and see that everything was all right, and then come in and start it; * * * "that he would go out there *every time* and look if the work was done because he knew what it was, and knew the piece of machinery it was, and *didn't want to see any man there,* * * * and that *he never turned on the power until he had ascertained in that way that everything was right."*

It is thus evident that on all previous occasions when Ondis had occupied the pit, except the fatal one, the engineer's universal practice before starting the machinery had been to find

out, either from his own view, or by the presence and statements of Ondis to him, that the latter had left the pit, and this course of practice Ondis must be presumed to have relied upon for his safety. But on the occasion of the accident the engineer, instead of first obtaining personal knowledge of the situation of Ondis, obeyed the order sent to him by Superintendent Parker to start the machinery.

The jury were warranted in finding from the testimony of three eye-witnesses of the occurrence, who were in close proximity to the pit, that Ondis was still standing in the pit either upon, or in very close contact with the screw, when it revolved after the machinery had been started. Not only so, but the very nature of the injuries inflicted upon the body of Ondis demonstrated this fact. The person who rescued him from the machinery, after the accident, said that he was obliged to cut intestate's flesh and clothing in disentangling him from the blades of the screw.

These eye-witnesses also testified that no notice or warning of the starting of the machine was given, by anyone in their hearing. to Ondis before the accident.

It is true that Superintendent Parker, in his testimony, says that before he sent the order to the engineer to turn on the power (which he admits he gave), he had "told Ondis to get out of the pit;" * * * that he "had given him a hand to pull him upon the bank, and saw him upon the bank," but the jury were plainly justified in coming to a contrary conclusion.

It is but just to the superintendent, in view of his testimony, to add, that when he sent the order to the engineer to start the machinery he probably supposed that Ondis had gotten fully out of the pit upon the bank. Nevertheless, the jury were justified in finding under the evidence that the former was guilty of negligence in ordering the power to be turned on too soon. And the question to be now determined is whether his negligence is legally imputable to his employer.

We think this negligent act of the superintendent, who assumed to act in the place of the engineer, is chargeable in law to the company. As has been fully shown above, the engineer had, in practice, on all previous occasions when Ondis had

been at work in the pit, kept in personal touch with him, and had, with the knowledge of Ondis, adopted and acted upon this method or system under which Ondis' safety was assured. This was the company's method of protecting its employes, and it follows that the failure of Parker (who assumed to act, and acted in this instance in the place of the engineer) to give Ondis warning that he was about to order the machinery to be started, was the failure of the company, and the former's negligence, that of the company.

The case is thus brought within the principles settled by a long line of adjudications of our courts, one of the earliest and most notable of which is that of *Belleville Stone Co.* v. *Mooney,* 32 *Vroom* 253, followed by *Germanus* v. *Lehigh Valley Co.,* 45 *Id.* 662, and a reference to the Digest Annotations will show how undeviatingly it has since been approved and followed by our courts.

The plaintiff in that case was injured by a piece of rock thrown out from a blast because the foreman had, through negligence, failed to give timely warning, according to a system or method previously pursued, and it was held, that the giving of warning was embraced in the duty owed by the employer to his employes, that the place where he sets them to work shall be kept safe; that the failure of the foreman to perform this duty carefully was imputable to the defendant as employer; and that such failure was not one of the obvious dangers of which the plaintiff as employe assumed the risk.

The place where the intestate was put to work by the defendant was liable to become one of exceptional peril to the former, and he had the clear right, under the settled rules of a long line of authority, to assume that his employer would take reasonable care to warn him before the danger became imminent and actual, and to proceed with his work in reliance upon this assumption, and since his employer had assigned to other servants the duty of giving such warning to him (the intestate), he had the right to depend upon its due and careful performance by them. *D'Agostino* v. *Pennsylvania Railroad Co.,* 43 *Vroom* 358; *Burns* v. *Delaware and Atlantic Tel. Co.,* 41

*Id.* 745; *Albanese* v. *Central Railroad, Id.* 241, and *Pakusew-ski* v. *Ringwood Company,* 52 *Id.* 552.

These other servants were not fellow-servants engaged in a common employment with him, the intestate, but are to be re-garded as acting in this respect as the representatives of the master, and the only question is whether they in fact exercised due care. See page 754 of *Burns* v. *Delaware and Atlantic Tel. Co.. supra; Laragay* v. *East Jersey Pipe Co.,* 48 *Vroom* 516; *Delaware, Lackawanna and Western Railroad Co.* v. *Hardy,* 30 *Id.* 40; *Polo* v. *Palisade Construction Co.,* 46 *Id.* 873.

The counsel of the plaintiff in error ably argue in their brief that the engineer's testimony brings the case at bar within the principle of the case decided by this court of *Koneski* v. *Delaware, Lackawanna and Western Railroad Co.,* 48 *Vroom* 645, 648.

In this case, as it was made by the plaintiff's evidence, it ap-peared that while he was at work for defendant, at night, close to its tracks, shoveling ashes at an ash-pit, one of the com-pany's engines, running upon its tracks, struck and injured him, no warning having been given by bell rung, or whistle blown, upon the engine striking him. This court held, in re-versing the plaintiff's judgment below, that the railroad's en-gineer, who had failed to give such warning, was to be regarded as a fellow-servant of the plaintiff, for the reason that the duty of giving the warning, under the facts there presented, was merely *incidental* to his *general* employment, and his failure to perform that duty was not imputable to the common employer.

But it will be observed by an examination of the reasoning (at *p.* 648) of the opinion, delivered by the Chief Justice, that after a careful analysis of many prior adjudications upon the subject he distinguishes that case from one like the case be-fore us, and I think it important to quote his language, viz.:

"In our opinion the present case comes within the principle of the Miller case, rather than within the Belleville Stone Company and Germanus cases. If an employe of the defend-ant had been *delegated* by it to attend at the ash-pit and warn

those at work there of the approach of engines, and his failure to give warning had been the producing cause of the accident to the plaintiff, the case would *then*, in its legal aspect, have been parallel with those last mentioned."

He adds: "But the duty of blowing a whistle, or ringing a bell, which rests upon the engineer in charge of an engine, is an *incident* of the *operation* of the *engine*, and failure to perform that duty, therefore, does not impose responsibility upon the master for injuries received by another employe in the common work."

This distinction, so pointedly drawn in the Koneski case, is manifestly applicable to the present. The jury were warranted in concluding from the evidence relating to the practice of warning, previously pursued and recognized by the defendant, that the engineer in charge of the motors had been *delegated* by it to, personally, ascertain whether or not Ondis was at work in the pit, and if in the pit to warn him, before he turned on the electric power. Under such method the intestate was justified in acting upon the belief that the company regarded it as a duty to adhere to that system of warning him to get out of the pit before the engineer started the machinery. This duty, Superintendent Parker, acting for the company in the stead of the engineer, failed to perform. Neither the engineer nor Parker were engaged therefore in a common employment with the intestate, but must be regarded as acting under the circumstances as the representatives of the company.

The judgment below, which was for the plaintiff, should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, PARKER, BERGEN, VOORHEES, KALISCH, BOGERT, VREDENBURGH, CONGDON, WHITE, JJ. 12.

*For reversal*—None.