POTLATCH LUMBER CO. v. ANDERSON.

(Circuit Court of Appeals, Ninth Circuit. October 7, 1912.)

No. 2,124.

1. MASTER AND SERVANT (§ 270*)—EVIDENCE—SIMILAR FACTS—DIFFERENCE IN TIME.

Plaintiff, who was employed by the superintendent of defendant lumber company while engaged in clearing roads in the woods, was struck and injured by a tree felled by other employés. He and another employé working near by testified that no warning was given by the choppers that the tree was about to fall, nor, when employed, were they notified of any rule requiring such warning, although there was testimony that such rule was customary in lumber camps, and that employés were usually instructed in respect to it. Held, that it was not error to admit the testimony of another employé to the same effect, although he was not working for defendant at the time, but had worked for it both before and afterward in different camps; such testimony being competent, as tending to show that defendant did not have or enforce such a rule.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 913–927, 932; Dec. Dig. § 270.*]

2. MASTER AND SERVANT (§ 286*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Where an employé of a lumber company, while engaged with others in clearing and making roads in the woods, was injured by a falling tree, cut by other employés, the questions whether the work was of such a hazardous character as to make it the duty of the company to promulgate and enforce rules requiring those cutting trees to give warning to the others when a tree was about to fall, and whether it performed such duty, were properly submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington.

Action at law by John Anderson against the Potlatch Lumber Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Edward J. Cannon, G. M. Ferris, and C. E. Swan, all of Spokane, Wash., for plaintiff in error.

Nuzum, Clark & Nuzum, W. H. Plummer, and Henry Jackson Darby, all of Spokane, Wash., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. John Anderson, as plaintiff in the court below, defendant in error here, brought this action in the superior court of the state of Washington against the Potlatch Lumber Company, plaintiff in error herein, a corporation doing a logging and lum-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ber business in the state of Idaho, to recover damages by reason of personal injuries sustained by him while working for the lumber company. The complaint alleged that on April 11, 1910, Anderson was directed by the foreman of the lumber company to work on the road used for taking out logs cut by the company in its woods near Bovill, Idaho; that it was the duty of the lumber company to use ordinary care in furnishing plaintiff with a reasonably safe place to work, and to notify him of the proximity of any choppers cutting timber in and about the work, to the end that plaintiff might protect himself from dangers, and watch the trees and the choppers near him, and avoid injury by the falling of trees; that when he had arrived at the point where he was ordered to work by the lumber company, without any warning whatsoever, and without his knowledge of the proximity of any choppers or any danger, a tree, cut by one of the employés of the lumber company, fell and struck plaintiff on his shoulder. It was charged that the lumber company was negligent in failing to notify plaintiff of the proximity of the choppers, and in failing and neglecting to promulgate or enforce rules and regulations whereby their business might be safely conducted, so that plaintiff and other employés would be protected from danger.

On motion of the lumber company, which is a corporation organized under the laws of Maine, the action was removed to the then Circuit Court of the United States for the Eastern District of Washington. After removal to the federal court, the corporation answered, denying negligence on its part, and setting up contributory negligence on the part of Anderson in failing to keep out of the way of trees which he knew were about to fall, and which he had been warned were likely to fall at any moment. Assumption of risk and negligence of Anderson's fellow servants were also pleaded.

Replication was made, denying all the affirmative defenses. There was a trial before a jury, verdict in favor of Anderson, and judgment duly entered in his favor.

Anderson had been a miner for many years, but on or about the 9th of April, just before he was hurt, he engaged to work for the Potlatch Lumber Company. In the lumber camp, where he went, there were about 200 men at work. Some were cutting trees and brush, and some were clearing roads. Anderson was directed to brush and clean and make roads. He says that when he went to work no instructions were given to him about how to protect himself in any way, nor was he warned concerning dangers; that just before he was hurt he was working cutting brush on a side hill about 1,500 or 2,000 feet from the place where he was injured; that he was sent down the hill by the man who ran the gang; that he was sent there to fix up the road, which at that point was swampy and wet, but that within a minute or so after he reached there a tree fell on him, striking him on the shoulder and arm, knocking him senseless; that he did not see anybody cutting the tree; that there was a great deal of high brush about him; and that he could not see through the brush to where the men stood who were cutting down the tree which fell

upon him. Plaintiff was in the hospital for a long time, suffered greatly, and was paralyzed.

On cross-examination, it was developed that, many years before he was injured, plaintiff had worked in sawmills, but that his principal business had been mining; that, when he went to work for the Potlatch Lumber Company, he saw men sawing trees and doing things that are always done in lumber camps; that on the morning when he went to work on the hillside he was cutting brush to make a road by which lumber could be hauled out; that men about him were cutting trees, and that teams were hauling logs; that in the afternoon, just before he was hurt, he had come down to a point where he met a teamster; that he (referring evidently to the teamster) told him he wanted him to fix the road, and that he showed him and pointed to the road; that at that time he heard a crack in the brush, looked up, and felt "the breath of the tree," and ran, but knew nothing more about the accident.

Felix Anderson, a fellow employé of John Anderson, an experienced woodsman, testified that he saw the tree fall on Anderson; that two men, foreigners, were chopping it; that he was on the hillside only 30 or 40 feet away, but heard no warning given to anybody that the tree was about to fall; that the tree was about 12 inches at the stump; that, when he and John Anderson went to work, they were never told anything of the dangers of the particular situation about the camp, nor was any information given to them about rules with reference to giving warning by people who were chopping trees to others who might be injured. This witness testified that he had worked in many of the lumber camps in Idaho, and that it was customary for warning to be given when a tree is about to fall, but that no instructions had been given by the Potlatch Lumber Company; that he himself always gave a warning whenever he felled a tree, by shouting "Timber! Timber!"

Another witness for Anderson testified that he had had much experience in lumber camps, and that the general custom is for the foreman to tell the men who are about to fall timber to be careful about teams and men who are working around, and that when they fall a tree to be sure and give a warning, the customary word being "Timber!" and that anybody who is a woodsman, and works in the woods, and hears that word, is supposed to know that a tree is going to fall.

Robert Chapman, a practical "lumber jack," who worked in the woods for many years, testified that he worked for the Potlatch Lumber Company in March, 1911, for a few days, and later in August or September, and in October, all apparently after Anderson was hurt, and in September, 1909, which was before Anderson was hurt. He said that there were no rules or regulations in the Potlatch camp; that sometimes warning would be given, and sometimes not; that some of the foreigners—Montenegrins and "Bohunks" or Bohemians— would give no warning; that when he went to work for the lumber company he was not given any instruction, and knew of no rules; that the custom of lumber camps was for any foreman to notify the men,

when they were about to fall a tree, to watch out for men and their teams.

On behalf of the defendant, Thomas P. Jones, the superintendent of the woods department of the Potlatch Company, testified that he had employed Anderson, but did not remember whether he ever talked with him of the danger of being hurt, but that Anderson had said that he had worked in the woods more or less for 26 years; that it was the custom of the camp to instruct foremen to warn the men when cutting timber, in order to give everybody opportunity to get out of the way before a tree falls, and to shout "Timber!" or "Under!" that the sawyers cut the trees; that after Anderson was injured, witness had had a talk with him, and that Anderson then made the statement of his experience as a woodsman; and that at the interview a representative of the counsel for the lumber company wrote a statement, which Anderson signed after reading it over.

Robert A. Jones, the foreman in charge of the gang at camp No. 4, where Anderson was hurt, testified that he told Anderson to go to work "swamping," after Anderson had told him that he had "swamped," and could "swamp" better than he could do anything else in the woods; that the custom was to tell sawyers to hollow and warn men when a tree was about to fall; that he gave such instructions to sawyers and "swampers"; that the two men who were felling trees when Anderson was hurt were foreigners; that the sawyers were working toward the men who were fixing the road.

The teamster referred to by the injured man testified that he was driving a team and saw the tree fall; that he hollowed to Anderson to watch out; that Anderson started, but that the tree hit him before he got out of its way; that there was nothing to prevent Anderson's seeing the tree from where he stood; that there was nothing except a little brush to interfere with Anderson's seeing the men who felled the tree which hurt him.

On rebuttal, John Anderson said that he could not read English.

[1] The lumber company assigns that the court erred in permitting the witness Robert Chapman to testify, over defendant's objection, that there were no rules or regulations adopted or enforced with reference to warning when trees were about to fall in camp No. 7 of the defendant, six months prior to the accident, for the reason that camp No. 7 was not the camp in which plaintiff was working at the time of the accident, being several miles distant therefrom, and under the charge of another and different foreman; also that the court erred in permitting the witness Chapman to testify, over defendant's objection, that there were no rules or regulations adopted or enforced with reference to warning when trees were about to fall in camp No. 4, during the month of March, 1911, for the reason that this was nearly one year after the accident, and was not competent or admissible.

The point can only be made clear by recalling these things: Anderson was injured April 11, 1910; but his case was not tried until November, 1911, or 19 months after his injury. Now at the trial, in

November, 1911, Chapman was asked to state what times he worked for the Potlatch Company. He answered:

"I worked for them last March a few days under Mr. Jones, at camp No. 4, and I worked there this summer a few days in August or the month of September, and a few days in October."

When asked whether he was working "there" when Anderson got hurt, he said he was not. Then came this testimony:

"Q. How long before that had you been working there? A. I worked there two years ago this last September. Q. How close up to the time that he got hurt did you quit there? A. Well, that was in the fall. I think it was in October I quit, and he did not get hurt until September [April]. Q. Did you work there in March, 1910? A. No; I didn't, then. Q. But you worked there after he got hurt, I believe? A. Yes, sir; I worked there last summer. Q. Now, Mr. Chapman, just describe how, when you worked there, was the work carried on down there in this camp, with reference to cutting timber and felling trees."

Objection was made, upon the ground of irrelevancy, immateriality, and incompetency, in that it did not appear that Chapman worked in the camp in question prior to the accident, nor until a long time afterwards. The court sustained the objection, saying that negligence could not be proved by some acts at some other time or place, even though by the same party. Thereupon counsel for Anderson said that he was not trying to prove negligence in respect to the particular act by proving some particular time, but was only trying to show the custom "down there," and the system used in camps; "in other words, to show there wasn't any system." Thereupon plaintiff offered to prove by the witness Chapman that during the fall of 1909,

"during the time the plaintiff was injured, he worked in the same camp among the men in the same class of work, and that at that time there was no system of rules there adopted or enforced to protect the men from being injured by the falling of trees, and that he worked there after the time during the same year that plaintiff was injured, when like conditions existed."

The offer was rejected. Plaintiff rested. Defendant moved for a verdict. The judge denied the motion for a directed verdict, and then stated that he believed the testimony of Robert Chapman with reference to the custom prevailing in the different camps, and which he had refused to admit, was relevant, and could be presented. Thereupon Chapman was recalled, and his testimony was received over the objections which had theretofore been made to the testimony, which were deemed applicable without restatement of such objections. Chapman was then asked this question:

"State how the work was carried on at this camp that you speak of, of the Potlatch Lumber Company, during the time that you worked there for them, before the injury to the plaintiff and afterwards, with reference to giving warning to men who might be injured by the falling trees. Just state how the work was carried on among the men."

Chapman replied that there were no rules or regulations at all. Witness was then asked whether "in this camp" it was ordinarily customary to give a warning. He testified:

"Sometimes those fellows would give you a warning, but more times they wouldn't. A certain class of people they wouldn't do it. Q. What class do

you mean? A. Those Bohunks, Montenegrins. * * * Q. And when these men would be falling these trees that you speak of, and wouldn't give any warning, or sometimes they would and sometimes they wouldn't, state whether or not Jones was around there with the men and see that. A. Most generally he was around all the time."

Witness also said that when he went to work there he was not given any instructions with reference to rules of the camp, and did not know of any rules. On cross-examination, Chapman said that he worked as a "swamper" last March, meaning March, 1911, under Robert Jones, and that, when he worked for the Potlatch Lumber Company before, he worked for Paul Gill, in camp 7, in charge of Gill. Counsel for the lumber company then carried on the examination:

"Q. Then you did not work in camp 4 until this summer? A. This last March. Q. And this man who was hurt was hurt more than a year before that; you know that, don't you? A. Yes, sir. Q. So that a little over a year after the man was hurt you worked for Robert Jones in his camp? A. Yes, sir. Q. And that's the only time you worked for Jones? A. That's the only time I worked for the man; yes, sir. Q. And that's the only time you ever worked at camp 4? A. Yes, sir. Q. How far was camp 7 from camp 4? A. I should judge about three miles. Q. About three miles away? A. Two or three miles. Q. How long did you work in March for Jones? A. I should think seven or eight days is all. I couldn't say whether it was seven or eight days. It was not any more."

We gather from the whole testimony of Chapman that the only time he worked in camp No. 4, where Anderson was injured, was in March, 1911, which, of course, was nearly a year after the accident. The confusion in his evidence arose because of the use of the adverb "there" in the questions put, which do not seem to have clearly specified camp 4. But counsel for the defendant company (plaintiff in error here) evidently drew the correct inference from the testimony, and the ruling of the court was based upon the understanding that Chapman had not worked in camp 4, at least recently, before Anderson was hurt. As we read the record, Chapman before the accident had worked at camp 7, which belonged to the Potlatch Lumber Company, but which was two or three miles away from camp No. 4. As we look upon the matter, however, it is not of special importance to determine just what particular time Chapman worked for the defendant company, because, conceding that he had never worked in camp 4 until nearly a year after the injury, it was not error for the court to permit him to testify that at that time there were no rules in force there; nor was it error to permit him to say that there were no rules or regulations concerning the conduct of men in felling trees in camp 7, although he only worked in that camp before the accident under investigation. Both camps were operated by the defendant in its system of lumber and logging camps. Camps 4 and 7 were only two or three miles apart, and Thomas P. Jones, who was called by the defendant, stated that he had been the superintendent of the woods department, and of the logging operations and camps of the corporation, and had employed the injured man. Plaintiff had testified that when he went to work he had never been given

any instructions about looking out for warnings of men who were felling timber, and Felix Anderson had testified that he had never had any information or instructions of such a kind. This constituted evidence which tended to prove that no rules upon that point had been promulgated by the lumber company, and we believe that it was competent for the plaintiff to show lack of system with respect to the giving of any such warnings, both before and after the accident, as circumstances bearing upon the probability of the truth of the proposition that there were no rules in existence at the time of the injury to Anderson. What weight was to be attached to such testimony became a question for the jury; but that it was competent, upon the principle that, when the existence of a condition at a given time is in issue, the prior existence of it, and the subsequent existence of it, afford some indication of its existence at the time in issue, seems quite clear. The remoteness of the times did not necessarily make the evidence inadmissible.

In referring to considerations which affect the use of subsequent existence as evidence of existence at the time in issue, Professor Wigmore, in section 437 of his work on Evidence, says:

"Here the disturbing contingency is that some circumstance operating in the interval may have been the source of the subsequent existence, and the propriety of the inference will depend on the likelihood of such intervening circumstances having occurred and been the true origin."

He then says that no fixed rule can be prescribed as to the time or the conditions within which a prior or subsequent existence is evidential, and that the matter should be left entirely to the trial court's discretion.

In Kennon v. Gilmer, 131 U. S. 22, 9 Sup. Ct. 696, 33 L. Ed. 110, the plaintiff, who had been injured in a stagecoach accident, introduced evidence tending to show that one of the leading horses in the defendant's stagecoach had been fractious and vicious on different occasions before the accident, and that on one occasion, 20 months after the accident, this same horse, when being driven in a buggy, kicked and broke the pole, and tried to run away. In discussing the objection to such evidence, Justice Gray, for the court, said:

"But evidence of subsequent misbehavior of the horse might properly be admitted, in connection with evidence of his misbehavior at and before the time of the accident, as tending to prove a vicious disposition and fixed habit, and to support the plaintiff's allegation that the horse was not safe and well broken. The length of time afterwards to which such evidence may extend is largely within the discretion of the judge presiding at the trial."

We find no error in the exercise of the discretion of the court.

[2] Error is assigned because the court held that it was for the jury to say whether or not the work in which Anderson was engaged was of such a hazardous character as to require the promulgation and enforcement of rules and regulations for carrying it on. The argument is that the work was not complex, in that it was but one crew, all of the men working in the same immediate vicinity, and all engaged in the cutting down of "small" trees and the

building of a corduroy road. We are of the opinion, however, that, when the situation as developed by the evidence is considered, it is clear the court in no way erred, at least against the lumber company, in deciding that the case stood upon "middle ground," where the question of necessity for rules and their enforcement became one of fact. The company had from 150 to 200 men working in the camp near to and about the place of the accident. Some were sawing, some were cutting brush, others were making roads, and others driving teams. A reading of the evidence justifies the view that the business was of a kind and extent where customarily there are rules for the protection of men whose safety may be endangered by the act of felling trees. The lumber company itself introduced witnesses to show that it followed a practice of instructing sawyers and "swampers" to warn men to look out for falling timber. This evidently was upon the theory that the work was of sufficiently hazardous a character to make such rules proper. It is but a fair observation that it would be unreasonable to expect a man in a crew of "swampers" to do his work of cutting down brush, and at the same time to protect himself against the danger of trees cut by men in another crew very near by falling upon him, unless the men cutting the trees, or some one knowing the danger, would give him warning.

There was no dispute over the general rule of law that, where a master is engaged in a complex or hazardous business, he must promulgate and adopt such rules and regulations for the conduct of his business and the government of his servants in the discharge of their duties as will afford reasonable protection to them, and that it is the duty of the master to use reasonable care to see that the rules adopted by him for the safety of his servants are complied with, and that if he fails to do so he will be responsible for injury resulting from failure of compliance. Nor was it disputed that the duties just specified are positive obligations imposed upon the master by law, and that he is liable for the negligent performance of such duties, whether he undertakes their performance personally, or delegates them to another.

It was a question of fact for the jury to determine whether or not the company adopted such rules, provided, of course, they found that the business was a hazardous one, which required the adoption and promulgation of rules. Furthermore, it was for the jury to say whether, if the rules were adopted, the lumber company exercised reasonable care to see that they were enforced. Nelson v. Southern Ry. Co., 158 Fed. 92, 85 C. C. A. 560. Olsen v. North Pacific Lumber Co., 100 Fed. 384, 40 C. C. A. 427, decided by this court, is not like the present case, for the reason that the facts are very different, and there was no evidence there that it was customary in sawmills to direct employés by special rules.

Finding no error prejudicial to the rights of the lumber company, and holding that the court properly refused to direct a verdict in its behalf, the judgment of the lower court will be affirmed.

So ordered.