## GEORGE ARVESON v. BOSTON COAL DOCK & WHARF COMPANY and Others.[1]

January 15, 1915.

Nos. 18,844—(103).

**Facts — injury to servant.**

1. Defendant company operated an unloading rig to unload coal from vessels to its dock. The two other defendants were hoisters and operated the machinery. Plaintiff was an oiler. It was extremely dangerous to oil the machinery when it was in motion. When plaintiff went upon the rig to oil, it was his custom to notify the hoisters, and it then became part of their business to keep the rig safe by keeping all machinery inoperative as

---

[1] Reported in 150 N. W. 810.

Note.—For the master's duty as to rules and regulations for conduct of business, see note in 43 L.R.A. 306. And as to the nondelegability of the master's duty to frame rules and regulations for the conduct of business, see note in 54 L.R.A. 86.

The question of the master's liability for negligence of a co-servant in respect to the details of the work is discussed in a note in 54 L.R.A. 106.

long as plaintiff was on the rig and until he gave them a signal that he was through. On the occasion in question plaintiff went on the rig to oil when the machinery was not in motion. There is evidence that he notified the hoisters. Nevertheless one of the hoisters started the machinery while plaintiff was upon the rig, without receiving his signal, and plaintiff was injured.

### Master's duty to provide safe place to work — enforcement of rules.

2. One of the absolute duties of the master is to use reasonable care to provide a safe place to work. This duty is not violated where the unsafety is caused by acts of co-servants in carrying out the details of the work. The master may adopt rules to facilitate the carrying on of his business, and these rules may operate for the protection of servants exposed to dangers. The question then arises whether the enforcement of such rules is an absolute duty of the master.

### Master's duty to enforce certain rules.

3. It is not the absolute duty of the master to see that every rule of his business is observed. His obligation in respect to mere details of the work is not rendered more extensive by the mere fact that he has systematized those details by adopting rules. If, however, the office of the rule is to provide a method for the discharge of some nondelegable duty of the master, then his duty to see that the rule is observed is absolute and nondelegable.

### Same — enforcement of rule to control independent work.

4. Where the servant is required to work in a place which is necessarily rendered dangerous by the doing of some independent work of the master, then the master is required to control such independent work while the servant is so engaged. If he adopt rules or sanction customs designed to effect this end, it is his duty to see that such rules or customs are observed, and he is liable for the negligent failure of those charged with that duty. It is *held* that the hoisters were vice principals, and defendant company is liable for their negligence.

### Damages not excessive.

5. The damages are not excessive.

Action in the district court for St. Louis county to recover $21,000 for personal injuries received while in the employ of defendant company. The case was tried before Cant, J., and a jury which returned a verdict for $11,000. From an order denying defendants' motion for judgment notwithstanding the verdict or for a new trial, they appealed. Affirmed.

*Abbott, MacPherran, Lewis & Gilbert* and *Washburn, Bailey & Mitchell,* for appellants.

*John Jenswold* and *C. R. Magney,* for respondent.

HALLAM, J.

1. Defendant coal company operates a coal dock at Duluth. Coal is unloaded from vessels to the dock by means of hoisting rigs. The one of these with which we are concerned is a movable steel structure about 40 feet high and 350 feet long. The essential features of this rig are as follows: A carriage 8 feet long runs on a track the whole length of the rig at a level of 30 feet or more above the floor of the dock. From this carriage is suspended the receptacle by means of which coal is unloaded. A walk runs alongside this carriage track for the full length of the rig. At a little lower level is a hoist house, 10 feet square, with a tin roof and walls of a single thickness of boards. The roof of the hoist house is on a level with the walk that runs alongside the carriage track. A ladder extends up the side of the hoist house; by this the employees ascend to the tin roof and thence proceed to the walk alongside the carriage track.

In the hoist house were located defendants Olson and Peterson, the hoisters, who operated from there the machinery that moves the rig and the carriage. Plaintiff was an oiler. It was his duty to oil the carriages and other mechanism of six rigs. The oiler determines when oiling is to be done. The work is not particularly dangerous as long as the machinery is not in motion, but a movement of the carriage while the oiler is upon it means almost certain death or serious injury. For this reason the regulations governing the hoisters are very explicit. After the oiler gives notice to the hoisters that he is going to oil, and goes out on the rig for that purpose, it is an invariable custom that the carriage must not be moved until the oiler gives a signal that he is through. It is the business of the hoisters to see to that. It is part of the duty for which they are hired, to keep the rig safe by keeping all machinery inoperative while the oiler is out upon the rig. Three sides of the hoist house are of glass, so that the hoisters may look out upon the rig for that purpose.

On the occasion in question and while the rig was not in operation, plaintiff came upon it to oil. As he did so he passed Olson who was standing just outside the hoist-house door. Plaintiff testified he told Olson as he passed that he was going to oil the carriage. Peterson was just inside the door, and within hearing. Plaintiff then went up the ladder on the side of the thin wall of the hoist house and walked along the tin roof over Peterson's head to the work of oiling the rig. While he was oiling the carriage, Peterson started it up, and caused the injury to plaintiff of which he complains.

The court instructed the jury that the negligence of Olson or of Peterson would be considered the negligence of the company; that, if Olson alone was negligent, plaintiff could recover against Olson and the company, and if Peterson was also negligent, recovery might be had against him. The jury found against all defendants.

There is little difficulty in sustaining the finding that Olson was negligent in not seeing to it that the carriage was not moved. We think there is also evidence to sustain a finding that Peterson knew plaintiff was going up to oil the carriage and that Peterson also was negligent. Peterson admitted that he was near enough to hear, at the time of the conversation between plaintiff and Olson, and on cross-examination admitted "It might be I heard something, but I can't remember." The jury might find that he did hear what was said and also that he must have heard plaintiff walk up the ladder outside this thin wall of the shanty and across the tin roof above his head. He may have forgotten, but this in no measure lessened his duty.

While the evidence seems sufficient to establish this fact of knowledge on the part of Peterson, we do not deem this vital to the case. We think the evidence is substantially undisputed that, under such conditions as existed here, it was not customary or necessary for the oiler to notify more than one of the hoisters, and that the duty to protect him then devolved on the one so notified. Plaintiff, Olson and Peterson all testified unequivocally to this fact. Only one other witness testified on the subject, the company's superintendent, Mr. Carr, who was called as an adverse witness by plaintiff.

He repeatedly testified as did the other witnesses. Upon being pressed on cross-examination, however, he said that if the hoisters are not together it is the duty of the oiler to notify both of them. But he made it clear that this applies to the cases that sometimes arise where there is "one man on one end of the bridge and one man on the other; then both of them got to be notified," or where one hoister "throws in the clutches" while the other is turning on steam, and the two are some distance apart; but referring to this case he said: "Both men are in the same place there," and they were but a few feet apart. Under such circumstances as existed here, the obligation of either one who was notified was as imperative as that of both could be, and, if the defendant was bound by the default of both, it was likewise bound by the default of either one.

2. This brings us to the more difficult question, whether the company was answerable for the neglect of these men. As a rule a master is not bound to indemnify his servant for injuries caused by the negligence of a fellow servant in the same common employment. This familiar doctrine was first introduced in England in 1837, in Priestley v. Fowler, 3 M. & W. 1, where a butcher's servant was held to have no cause of action against the master for the breaking down of a van, due to overloading by another servant with whom he was riding. The doctrine was first introduced in the United States in 1841, in Murray v. S. C. Railroad Co. 1 McMullan (S. C.) 385 (49), where plaintiff, a fireman, was injured by the derailment of an engine due to the negligence of the engineer whom plaintiff had selected as his associate, and whom plaintiff had warned of the danger. The cause is one of the first arising out of the conveyance of human beings by locomotives on railroads. In these cases some emphasis is laid upon the fact that the association of the employees afforded both opportunity and duty to protect themselves from the negligence of one another. In the next reported case, however, Farwell v. Boston & W. R. R. Co. 4 Metc. (Mass.) 49, 60, 38 Am. Dec. 339, Shaw, C. J., makes it clear that "the master * * * is not exempt from liability, because the servant has better means of providing for his safety, * * * but because the im-

plied contract of the master does not extend to indemnify the servant against the negligence of anyone but himself," and "hence the separation of the employment into different departments cannot create that liability."

In the tremendous number of fellow-servant cases that have followed there is conflict between two tendencies, the one a tendency to extend the general rule of nonliability applied. in these early cases, to the complex and dangerous conditions incident to the machinery and appliances of later times, and the other a tendency to increasingly make exceptions and place limitations upon the general doctrine, in order to conform the law to new and changed conditions. The result is the recognition of an increasing number of absolute duties of the master.

One of these absolute duties of the master is the duty to use reasonable care to provide a safe place to work. This duty is not violated where unsafety is caused solely by the acts of coservants in carrying out mere details of the work. 4 Labatt, Master & Servant, § 1531.

The master may adopt rules to facilitate the carrying on of his business, and these rules may operate for the protection of the servants exposed to danger. The question then arises whether the enforcement of such rules is an absolute duty of the master.

3. It cannot be said that an employer owes to his employee an absolute duty to see that every rule of his business is observed. The obligation of the employer in respect to the supervision of mere details, is not rendered more extensive by the fact that he has systematized the execution of those details by adopting suitable rules. Such rules do not alter the character of the acts to which they relate. 4 Labatt, Master & Servant, § 1506. If, however, the office of the rule is to provide a method for the discharge of some nondelegable obligation, the duty of the employer to see that the rule is observed is absolute and nondelegable, for "the liability resting upon him for the proper performance of the   *   *   *   duty is not shifted by the adoption of rules or regulations providing for the performance of the act or duty by the agent of the master." Hankins v. New York L. & E. R. Co. 142 N. Y. 416, 37 N. E. 466, 26 L.R.A. 396, 40 Am. St. 616.

4. In this case there existed a custom so well established that it had all the force of a rule, the observance of which would have fully protected plaintiff. Was it a custom providing a method for the discharge of some absolute duty of the defendant company? We think it was. It was the clear duty of the defendant company to keep this place of work free from the exceedingly great danger incident to the operation of the carriage, and to make and enforce proper regulations to that end. If these hoisters had been charged with the duty of giving plaintiff a customary warning before starting the machinery, the duty so imposed would, under repeated decisions of this court, have been an absolute duty of the company, and their negligence its negligence, for the rule in this state is that, "where the place of work is inherently dangerous, and signals are required by order of the master or, by common custom, for the protection of the employees and to provide and to maintain for them the safety of their place of work, and are relied upon by the employees as a means of saving themselves from harm, it becomes the absolute duty of the master to give them, and a failure to do so, though the failure be the neglect of a servant engaged in the common employment, renders the master liable to a servant who is injured in consequence of the neglect." Elenduck v. Crookston Lumber Co. 121 Minn. 53, 55, 140 N. W. 125; Anderson v. Pittsburgh Coal Co. 108 Minn. 455, 466, 122 N. W. 794, 26 L.R.A.(N.S.) 624. And this is in accord with recent decisions in other jurisdictions. Western Electric Co. v. Hanselmann, 136 Fed. 564, 69 C. C. A. 346, 70 L.R.A. 765; Potlatch Lumber Co. v. Anderson, 199 Fed. 742, 118 C. C. A. 180; Lucey v. Stack-Gibbs Lumber Co. 23 Idaho, 628, 131 Pac. 897, 46 L.R.A.(N.S.) 86; Belleville Stone Co. v. Mooney, 61 N. J. Law, 253, 39 Atl. 764, 39 L.R.A. 834; Ondis Admx. v. Great A. & P. Tea Co. 82 N. J. Law, 511, 81 Atl. 856, 46 L.R.A. (N.S.) 777; Comrade v. Atlas Lumber Co. 44 Wash. 470, 87 Pac. 517.

These hoisters were not charged with the duty of giving plaintiff a warning before moving the machinery. Warning would have been of no avail. The machinery must not move at all. They were charged with the duty of doing the one thing that would keep this

place safe during the time plaintiff was there engaged; that is, to see to it that the machinery was not moved until plaintiff said the word. It seems almost captious to say that a duty to give an employee a customary signal before starting dangerous machinery is a personal duty of the master, and yet a duty to keep the machinery inoperative until a customary signal is received from the employee subject to the danger, is a mere detail of the work, where both the purpose of the custom and the consequence of its disobedience are in each case absolutely the same. It seems to us a sound and humane principle that, where an employee is required to work in a place which is necessarily rendered dangerous to life and limb by the doing of some independent work of the employer, the employer should be required to stop such independent work and keep it inoperative while the employee is so engaged. The employer cannot rid himself of this duty by delegating it to others, and, if he adopt rules and sanction customs designed to accomplish this end, it is his duty to see that such rules or customs are observed, and an employee charged with the duty of securing their observance is a vice principal.

This holding is in line with many recent cases.

In Paauhau Sugar Plantation Co. v. Palapala, 127 Fed. 920, 62 C. C. A. 552, injury resulted from negligence of a winchman operating a crane in prematurely lowering a load of sugar. It was the winchman's duty to lower it part way and then wait until the boatman signaled him to lower the sugar into the boat. The master was held liable for injury to the boatman due to lowering the load into the boat without signal. Hawley, J., said: "The responsibility of appellant for the negligence of the winchman is well settled."

In Massy v. Milwaukee Ele. R. & L. Co. 143 Wis. 220, 126 N. W. 544, 40 L.R.A.(N.S.) 814, 139 Am. St. 1096, it was held that an employee charged with the duty of connecting and disconnecting an electrical current from wires is not a fellow servant of a lineman whose duty is to work on the wires, so as to relieve the master from liability for injury to the lineman by the negligence of the operator in turning current, contrary to instructions, onto a wire upon which the lineman was at work.

In Gerrish v. New Haven Ice Co. 63 Conn. 9, 27 Atl. 235, plain-tiff was engaged with other employees in conveying ice through a run into an ice-house. Plaintiff was, in the course of this work, ordered to go into the run to remove a broken float. Defendant had a rule that the superintendent or person in charge of the run should at such time cause the engine to be stopped and the engineer to be personally notified, and that after such notice the engineer should not start the engine upon the ordinary signal, but only upon a special direction to do so. The engineer was not so notified, and had no knowledge that plaintiff was in the run, and started the engine upon hearing the ordinary signal given in some manner unknown. It was held that the disobedience of the rule was the neglect of the defendant. See also Hunter v. Alderman & Sons Co. 89 S. C. 502, 71 S. E. 1082; Koerner v. St. Louis Car Co. 209 Mo. 141, 107 S. W. 481, 47 L.R.A.(N.S.) 292; Murphy v. N. Y. C. & H. R. R. R. Co. 118 N. Y. 527, 23 N. E. 812; Salmons v. Norfolk & W. Ry. Co. (C. C.) 162 Fed. 722.

We hold that the hoisters were vice principals, and defendant company is liable for their negligence.

The jury assessed plaintiff's damages at $11,000. The damages were not excessive. Plaintiff sustained a compound fracture of the upper part of the right thigh; the bones protruded and the muscles separated; there was also a comminuted fracture of the leg below the knee. There was much hemorrhage and a large amount of sloughing of the muscles. Infection set in, large pieces of muscle came out. The leg shortened two and one-half inches. Plaintiff's suffering was intense, and for some time he was in a very critical condition. He will never be able to resume his former occupation or to do any heavy work. The leg has practically lost its usefulness. His earnings were from $60 to $90 a month, varying with the seasons of the year. The damages, though large, are not clearly excessive.

Order affirmed.