**THURLOW et al. v. FAILING et al.**

No. 17999. Opinion Filed July 31, 1928.

Rehearing Denied Dec. 4, 1928.

278

Freeling & Box and Crowe & Crowe, for plaintiffs in error.

Simons, McKnight, Simons & Smith, for defendant in error.

DIFFENDAFFER, C. This is an action for damages for the alleged wrongful death of William Earl Thurlow. On and prior to May 4, 1925, defendants Failing and Lawson were the owners of an oil and gas lease situate in Garfield county, some five miles from Garber. They were at that time engaged in drilling a well for oil and gas. They owned the rig and machinery, known as a "Star Rig." On May 4, 1925, the well had been drilled to a depth of about 1,400 feet, when it became necessary to run a string of 8-inch casing in the well. On the morning of May 4th, C. E. Lawson directed his son to round up a casing crew to run the casing. Defendant Bruce at that time was running a casing crew in the field near Garber, and Lawson's son, not being able to find Bruce, requested one Vandiver, who it appears had been associated with Bruce, to get up a crew and send them out to the well to run the casing. Vandiver, not being able to find the regular members of the casing crew, approached Thurlow and asked him and his companion. Ralston, to go out as members of the crew. Two other men had already been employed and after employing Thurlow and Ralston, another man, Joe Helm, was employed, thus making the necessary number of five to form a casing crew. The crew proceeded to the well, and after some delay began running the casing about 5:30 o'clock p. m. From the record it appears that the crew were assigned to their respective places Thurlow was assigned to operate what was termed the rear casing wagon, and Ralston to the front casing wagon These casing wagons were small two-wheeled trucks with handles to push or pull the same. The casing was stored upon a rack some 20 or 30 feet east from the well where joints of casing, which were shown to be about 20 feet long, were to be taken one at a time from the rack and placed in the well. It was the duty of Ralston and Thurlow to go with the casing wagons and place the joint of casing thereon and roll it into the rig with one end a foot or two from the well. In doing this, Ralston would operate the front wagon, that is the one nearest the well, and Thurlow the rear wagon, or at the end farthest from the well. When the joint of casing had been brought to the well, it then became the duty of the driller, who was operating the machinery to lower what is termed "the casing block," to which was attached what was termed "the elevators," composed of a clamp which would be fitted or adjusted around the casing at the end near the well, below a collar which was screwed on the end of the joint or casing, and to this clamp the casing block was attached. It was the duty of Ralston to thus attach the elevator to the joint of casing. When this was done, the driller would then by means of the machinery hoist or raise the joint of casing until it was perpendicular and would swing alone and directly over the joint of casing already in the well. When it is thus suspended, one member of the casing crew, who is called the "stabber," who is stationed in the rig some 20 or more feet above the well, guides the joint of casing as it is lowered by the driller so as to fit the lower end of the joint into the collar on the joint of casing already in the well. When this is done, it

then becomes the duty of the two men who operate the casing wagons to assist the other two members of the casing crew to screw the joint of casing securely into the collar on the joint in the well. This is done by means of a rope and a bar, some 8 or 10 feet long, called a "never slip." The rope is wound around the joint of casing and attached to the bar in such way that the bar forms a lever extending 4 or 5 feet each way from the joint of casing, and the four members of the casing crew turn the joint of cashing until the driller decides it is tight enough. The driller then applies the power and raises the string of casing in the well, thus releasing the two wedge-shaped slips, which are removed by two members of the casing crew. The driller then reverses the machinery and the casing is lowered in the well by its own weight, the driller using a brake device in the machinery to prevent it from descending too rapidly. While the joint of casing is being thus lowered into the well, the two members of the casing crew who operate the casing wagons return to the casing rack and bring up another joint of casing, and the operation is repeated. Each member of the casing crew thus has certain definite duties to perform. With a rig, such as the one used here, the power for raising and lowering the casing is applied as follows: A large wooden mast, some 50 or 60 feet long, extends upward from the rig, held in place by guy wires. About 8 or 10 feet below the top of the mast is attached a pulley or set of pulleys consisting of iron or steel wheels, with grooves in the rim. A cable is wound around a drum in the rig to which drum the power of the engine is attached in such way that the drum may be caused to revolve in either direction. This cable extends from the drum up to and over one of the wheels or pulleys attached to the mast and down to what is termed a "casing block," which consists of a set of grooved pulleys arranged in a large block, with a hook on one end by which it is attached to the links of the elevators. The cable runs through this block over one of the grooved pulleys or wheels and back up to the block on the mast through it over another wheel and down again to the casing block up and over a third wheel in the block attached to the mast and down in the casing block again, and over a third wheel and up the block on the mast where the end is attached firmly to the block. The block of pulleys attached to the mast is termed a "sheave." When the power is applied to the drum, causing it to revolve, the casing block with the elevators attached is raised from the floor of the rig, and when the power is released the casing block is lowered by its own weight. The casing block fully rigged weighs about 2,000 pounds. The crew had the been thus engaged until about 10:30 o'clock p. m., at which time they had run about 40 joints, or 800 feet, of casing into the well. The machinery had worked in the usual way, and nothing out of the ordinary had occurred, when, at that time, while the casing block was being lowered for the purpose of attaching the elevators to a joint of casing, the block stopped about three feet from the floor, and as one witness described it: "The casing blocks refused to roll down as is usually done so we could hook into the joint of pipe." When this occurred, it appears that the drum upon which the cable was wound continued to revolve for a while so that some of the cable was unwound forming what was termed a "slack" in the cable. It appears from the record that it was not known what had caused the casing block to stop, and an effort was being made to ascertain the cause thereof. At this point, it will be explained that all the machinery that was being used was the regular machinery used in drilling, and belonged to the owners of the well, Failing and Lawson; that the driller and tool dresser were the regular employees of Failing and Lawson and the driller had charge of and was directing the operations. The casing crew was employed and paid by Bruce, but the record does not disclose just how Bruce was paid for his services, but it is fairly clear that he paid the casing crew and was paid out of a commission or percentage on their wages. Neither Bruce nor Failing and Lawson was on the job at the time the accident occurred. Thurlow and Ralston were not regular casing men, but were both experienced drillers, each having had 10 or 12 years' experience as drillers. When the casing block stopped, both Ralston and Thurlow went, without any direction from the driller, to help ascertain the trouble. The driller applied the power and took up the "slack" in the line, and, Ralston went to a point at one side of the rig to ascertain whether, in taking up the slack, the cable had wound or "spooled" smoothly on the drum. In order to do this, he leaned over with his head above a brace that ran diagonally from the rear of the frame of the rig up to another nearly upright post or brace nearer the front end. Near this brace and on the outside of the rig a crank attached to a shaft, which revolved when the machinery was in motion,

was attached. This connecting rod or shaft running from this crank to the beam is detached when casing is being run so that the crank turns idly when the machinery is used running casing. When the shaft is revolved to the right, the crank turns so near this brace and along the side thereof so as to form a sort of "shears" so that one leaning over or across the brace while the machinery is not in motion would be in no danger, but if the machinery is started suddenly he would be immediately decapitated if he remained in that position by the first revolution of the shaft if the machinery is started so as to cause the shaft to revolve to the right. Ralston took this position after the slack had been run out of the cable and the machinery stopped. Thurlow was standing nearby. After Ralston ascertained that the cable was wound properly he returned to his position near the well and left Thurlow standing near the crank. As Ralston returned to his position the driller again applied the power in an effort to lower the casing block. The block again failed to descend and the cable was again wound off the drum causing a slack therein. The driller then ordered the "stabber," whose position was upon the beam, to pull down on the cable. The driller again applied the power and took up the slack. About that time the driller ordered the tool dresser to ascend the mast and examine the sheave. The machinery was again started and the casing block again failed to descend. Ralston then started out from the rig to examine the condition of the light at the top of the mast to see if the tool dresser had sufficient light to see and examine the pulley. As he went out he found the body of Thurlow lying on the walk near the crank with the head completely severed below the ears. No one saw how he was killed, but upon an examination of the machinery, blood, hair and some fragments of skin were found on the brace and crank, so that it appears that the only way he could have been killed was that he must have been leaning over the brace looking as to how the cable had been wound after the slack had been taken up the second time, when the machinery started and the revolving crank caught his head on the brace and severed it from the body. As stated before, this action was brought for damages for thus causing his death.

The cause was tried to a jury, and at the close of plaintiffs' evidence, separate demurrers of defendants thereto were sustained and judgment entered for defendants.

After motion for new trial was filed and overruled, plaintiffs bring this appeal.

Plaintiffs in their brief say that three separate theories of negligence are relied upon:

(1) Negligence of the defendants in furnishing defective and faulty machinery.

(2) Negligence of the defendants by and through their superior servant and vice principal in operating said machinery in a defective, unsafe and dangerous condition.

(3) The negligence of said defendants through their fellow servant and vice principal in setting said machinery in motion without warning.

The answers of defendants Failing and Lawson admit that they were interested in and engaged in drilling the well, but deny that Thurlow was in their employ at the time he met with the accident that caused his death, and that they had entered into a contract with Bruce, who they say was the proprietor of and operating the casing crew to run the casing in the well for a sum certain, and that under said contract they had no right or authority to direct, control or supervise the work of running the casing, and that Bruce was an independent contractor. This defense, however, is not urged in the briefs and in the oral argument was abandoned. They also pleaded that at the time Thurlow was killed, he was in a place where he was not required to be and where he had no right to be, and at that time he was not engaged in the work of running the casing into the well, and that he was not performing any duty which was incident thereto. They also pleaded contributory negligence and assumption of risk.

Defendant Bruce filed a separate answer substantially the same as Failing and Lawson, alleging that he was an independent contractor and that Thurlow was his employee.

From the record it appears that no further work was done toward running the casing that night after Thurlow was killed, and that when the crew returned to the rig the next morning about 8 joints of casing were run, when the casing block stopped again, and on an examination of the pulley attached to the mast disclosed that one of the wheels over which the cable ran was out of order to such an extent that the wheel would bind against the casing or block. The evidence is not clear as to whether the wheel itself was worn where it revolved upon the axle or shaft upon

which it revolved so as to cause the binding or whether the boxing or housing through which the shaft ran was broken, but it does appear that the defect in the pulley, or as the witnesses called it, the "sheave," was what caused the casing block to hang and fail to come down to the floor of the rig.

It is a well settled principle of law:

"It is the duty of a master to exercise ordinary care and prudence in providing servants with a reasonably safe place in which to work, reasonably safe tools and materials with which to work, and reasonably safe and competent fellow servants with whom to work; and a failure in one or more of such duties will render the master liable for damages proximately resulting from such failure."

So that, it being conceded that Bruce was not an independent contractor, if from the evidence in this case it can be said that the defect in the machinery was the proximate cause of the injury which caused the death of Thurlow, then, if the masters, Failing and Lawson, or assuming that Bruce in the instant case was also a master, Failing and Lawson and Bruce, or either of them, failed to exercise reasonable care and prudence concerning the machinery and tools that were furnished with which to run the casing into the well, then it was error to sustain the demurrer to plaintiffs' evidence. The record discloses that the only inspection of the pulley or "sheave" made before the crew started to run the casing was by Fred Heckel, Jr., the tool dresser, who testified that some time in the forenoon of the day the casing crew went to work he ascended the mast and oiled the pulleys, and that he notice nothing wrong with the pulley or sheave except that the wheel appeared to be worn, and that all the difficulty was its being worn.

While it may be said that there is some evidence tending to show that the machinery was not in a safe condition as to the pulley, can it be said from the evidence that the defect in the pulley or "sheave" was the proximate cause of the injury? We think not. No injury whatever is shown to have resulted from this defect. In St. Louis & S. F. Ry. Co. v. Snowden, 48 Okla 115, 149 Pac. 1083, it was said:

"There must be causal connection between the negligence averred and the injury suffered to entitle plaintiff to recover, and this rule is so well established that it is unnecessary to support same by authority."

So, assuming that the defendants were guilty of a breach of duty in failing to furnish reasonably safe machinery with which to work, yet plaintiffs cannot recover if from all the evidence, together with all the inferences that may be reasonably drawn therefrom, it does not appear that the defect in the machinery was the proximate cause of the injury. In Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256, it is said:

"But it is generally held that in order to warrant a finding that negligence or an act not amounting to wanton wrong, is the proximate cause of an injury it must appear that the injury was the rational and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

The other acts of neligence relied upon are: Operating the machinery in a defective, unsafe and dangerous condition, and in setting said machinery in motion without warning.

It is earnestly contended by plaintiffs that if deceased was performing a duty comprehended by his employment at the time of his death, the act of the driller in setting the machinery in motion without warning was such negligence as would warrant a recovery.

The trial court in sustaining the demurrers to the evidence said:

"There is no evidence in this case that tends in the slightest, in the opinion of the court, to show that at the time of the injury of Mr. Thurlow that he was in the discharge of a duty that came within his scope of employment as a member of the casing crew. The evidence shows that his work at the time of the injury was upon the rear truck in bringing up this casing, and that there was nothing under his duties in that employment that called him to be at the place where he was at the time he received the injury that resulted in his death, and that he was not there by the order of a superior servant or by order of the master, and for that reason, under the laws of this state, as announced by the Supreme Court of the state of Oklahoma, the plaintiff would not be entitled to recover."

It is conceded by plaintiffs that, under ordinary circumstances, that is, when the machinery was working normally, there was nothing coming within the scope of employment of deceased that would call him to or near the place where he met his death. But plaintiffs contend that under the evidence, when something went wrong with the machinery, it then became the duty of deceased to assist in repairing or putting the machinery in order, and that in the instant case deceased was engaged in performing this duty when he met with the

injury. To sustain this contention, plaintiffs refer us to the following evidence by three witnesses, who were experienced drillers or casing men:

"Q. What, generally, were the duties of a casing crew when there is a break-down in the machinery on the well, or any kind of trouble similar to this you have just described? A. It is their duty to go and help fix it as quick as they can. I never knew one to stop anyone from helping. Q. When a casing crew is working, who gives them orders and directions about their work? A. Well, usually the driller. Q. Are they subject to his orders? A. Well, if he tells them to go ahead and do something about putting in the pipe or rigging up, they go ahead and do it. Q. Is that the general practice? A. Yes, sir, the casing is done that way."

See, also, the testimony of witness Nayder, of some 20 years' experience as driller and caser.

"Q. What are the duties or the custom of the casing men when any temporary trouble occurs about the rig? A. They always—they are supposed—every place I have been, they always help, and help fix up. They are not supposed to build the rig, but supposed to help fix anything in connection with what it takes to help put the pipe in. Q. What does the driller do when temporary trouble occurs? A. When the casing crew is there? Q. Yes. A. The casing crew helps to fix it. Q. And what is the custom, Mr. Nayer, if those casing men should refuse to help in temporary matters of that kind? A. Never had any trouble. Never was where anybody refused to."

See, also, the testimony of witness Ralson, likewise of many years' experience in drilling and casing.

"Q. Mr. Ralson, if I understand you correctly, I believe you said that the driller had charge of the drilling of the well? A. Yes, sir. Q. What instructions, if any, would he give these casing men? A. He would instruct them in any work there was—there was to be done. Q. If anything happened temporarily, what would the casing men do with regard to helping out with it? A. They would follow instructions, and if no instructions were given, they would use their own judgment. Q. That is, if the driller gives them instructions, they would follow him, and if he did not, they use their own judgment? A. Yes, sir. Q. Did you hear him (the driller) instruct the man on the beam to pull down on the line? A. Yes, sir. Q. And that was Mr. Adkins that gave these instructions? (Adkins was the driller.)"

We think the rule in such case is well stated in 39 C. J. 279, where it is said:

"Where the circumstances are such as to justify a man of ordinary prudence in regarding the thing as a part of his duty, the servant will be deemed to be acting within the scope of such duty. Thus, when, in the presence of an emergency, an employee steps outside the strict bounds of his duties, he is held to be within the general scope of his employment where such action is taken to preserve or protect the lives of himself or others, the property of his master, or even where such a course is reasonably called for in order that the master's business may properly proceed, and the right of an employee so to act in an emergency is not affected by the fact that the necessary work is ordinarily done by others under his charge and upon whom he had a right to call."

The rule stated is well supported by the authorities cited, and we think the trial court was in error in holding that there was no evidence tending to show that Thurlow when he was killed was not acting within the scope of his employment.

We think, however, that the evidence wholly fails to show that the driller, Adkins, was guilty of any negligence in starting the machinery without warning of his intention so to do. There is no evidence tending to show that the driller knew that Thurlow had left his station and gone to the place where he was killed, or that setting the machinery in motion would endanger him or any of the other employees. The machinery was constantly being started and stopped. From the evidence, it does not appear that the driller had any reason whatever to know that Thurlow was where he might be injured. The driller had not given any orders or directions for him to go to that or any place, other than his accustomed station.

The rule is well settled that the fact of an accident or injury to an employee carries with it no presumption of negligence. Negligence is an affirmative fact for an injured employee to establish in order to render the employer liable. C., R. I & P. Ry. Co. v. Nagle, 55 Okla. 235, 154 Pac. 667; C., R. I. & P. Ry. Co. v. Foltz, 54 Okla. 556, 154 Pac. 519; Midland Valley Ry. Co. v. Graney, 77 Okla. 54, 185 Pac. 1088.

It is the duty of the master to warn his employees of danger arising out of the progress of the work which is known to him and unknown to them, and this is a nondelegable duty, 39 C. J. 634; Ardeson v. Boston Coal Co., 128 Minn. 178, 15 N. W. 810; Cook v. Atlas Portland Cement Co. (Mo. App.) 263 S. W. 1067; Ondis v. Great Atlantic & Pac. Tea Co. (N. J.) 81 Atl. 856.

In 39 C. J. 490, it is said:

"The master's liability in respect of warning and instructing his servant depends up-

on his knowledge, actual or constructive, of the defect or danger to which his servant was exposed, and negligence cannot be imputed to him unless he knew, or ought, in the exercise of reasonable and ordinary care and diligence, to have known, that a warning was necessary."

There being no evidence whatever tending to show that the driller, Adkins, knew, or by use of ordinary care would have known, of the presence of Thurlow in a place where the starting of the machinery would likely injure him, it follows that there was a total failure of proof of primary negligence, and that for this reason the demurrers to plaintiffs' evidence were properly sustained.

The judgment should be affirmed.

LEACH, HERR, JEFFREY, and FOSTER, Commissioners, concur.

BENNETT, Commissioner, dissents.

By the Court: It is so ordered.